### HOWARD MILLNER v. THE STATE.

No. 2616. Decided November 19, 1913.

**1.—Murder—Accomplice—Severance—Practice in District Court.**

Where defendant was indicted as an accomplice with the wife of the deceased and each made a motion for severance, but they could not agree which should be tried first, there was no error in the court's action in directing that defendant should be tried first; especially, as a continuance would have otherwise resulted.

**2.—Same—Continuance—Practice on Appeal.**

Where the judgment is reversed and the case remanded upon other grounds, the overruling of an application for a continuance need not be considered.

**3.—Same—Evidence—Flight.**

Where the State did not attempt to show the flight or escape of the defendant, there was no error in not permitting defendant to prove that when he had an opportunity to escape, he did not do so.

**4.—Same—Evidence—Interrogating Witnesses.**

Where no error appeared as to the interrogation by State's counsel of a witness, there was no error.

**5.—Same—Evidence—Automobile.**

Upon trial of murder, there was no error in admitting testimony to the effect that a person of ordinary hearing could have heard the coming of an automobile, etc.

**6.—Same—Practice in District Court.**

Upon trial of murder, there was no error in the trial judge's action in cautioning the jury about their conduct during the trial.

**7.—Same—Conduct of State's Attorney.**

Where none of the questions asked by the State's counsel and his conduct connected therewith were of such a nature as could have injured the rights of defendant, there was no reversible error.

**8.—Same—Reproduction of Testimony—Examining Trial Testimony.**

Where, from all the testimony, the trial court was justified in his conclusion that the absent witness was beyond the jurisdiction of the court, there was no error in admitting the written testimony of said witness taken on the examining trial of the defendant at which the latter was present and cross-examined the witness. Davidson, Judge, dissenting.

**9.—Same—Evidence—File Marks.**

Because the clerk of the court had placed his file mark on certain written testimony, this did not render the same inadmissible.

**10.—Same—Side-bar Remarks—Practice in District Court.**

Where the court instructed the jury not to notice side-bar remarks of the district attorney, there was no reversible error, although the court should caution attorneys not to indulge in side-bar remarks.

**11.—Same—Practice in District Court—Cautioning Jury.**

Where the court had properly instructed the jury, whenever a recess was taken in a murder case, not to discuss the same among themselves, but omitted to do so formally at one time, this did not constitute error.

**12.—Same—Evidence—Third Parties, Acts of.**

Upon trial of murder, there was no error in introducing testimony that defendant's watch was found on and taken off of the person of his principal when the latter was arrested.

**13.—Same—Evidence—Motive.**

Where, upon trial of murder, testimony was admitted that defendant borrowed money from the witness and stated that he wished to get the money to help his principal get away, there was no error.

**14.—Same—Evidence—Letters—Motive—Filing.**

Where defendant was indicted as an accomplice with the wife of the deceased in the murder of her husband, there was no error in admitting in evidence certain letters which said wife had written to defendant before the murder and which had been found in defendant's grip and had been clearly identified, and which bore on their illicit relations; and the fact that they were filed by the clerk after they were read in evidence was not a valid objection.

**15.—Same—Principal—Evidence—Confessions.**

Upon trial of an accomplice to murder, there was no error in admitting in evidence the confessions of the principal which were in writing, after being duly warned, the court properly limiting said confessions. Davidson, Judge, dissenting.

**16.—Same—Rule Stated—Guilt of Principal Accomplice.**

In the trial of an accomplice, it is necessary for the State to prove the guilt of the principal, and testimony which would be admissible against the principal if he were on trial is admissible against the accomplice. Following Thomas v. State, 43 Texas Crim. Rep., 20, and other cases; the court properly limiting said testimony.

**17.—Same—Mental Condition of Defendant's Principal.**

Upon trial of murder, testimony as to the physical condition of defendant's principal while in jail was admissible, but not his mental condition showing that he could be influenced.

**18.—Same—Hearsay Evidence—Age of Principal.**

Upon trial of defendant as an accomplice to murder, the court did not err in excluding the hearsay testimony of the principal's father as to the age of said principal.

**19.—Same—Evidence—Self-serving Declarations.**

Upon trial of defendant as an accomplice to murder, there was no error in not permitting defendant to prove that defendant's principal had told witness that he killed deceased to get his money, in order to contradict said principal's confessions; this was self-serving testimony. Davidson, Judge, dissenting.

**20.—Same—Accessory—Charge of Court.**

Where the evidence did not call for a charge that a certain State's witness was an accessory, there was no error in the court's failure to charge thereon.

**21.—Same—Self-defense—Charge of Court—Principal—Accomplice.**

Where defendant was indicted as an accomplice to murder and the State had introduced in evidence the confession of the principal that he killed deceased, who also claimed self-defense, and the court submitted a charge on self-defense in accordance with the evidence, defendant's complaint to said charge that it limited his principal's defense so as to exclude his apparent danger was without merit.

**22.—Same—Exculpatory Statements—Charge of Court.**

Where the confessions of the principal were admitted solely for the purpose to show that he did the killing, and not as otherwise affecting defendant, the State was not bound thereby in other matters and compelled to take them as true, unless the falsity of such other matters were shown by the State.

**23.—Same—Practice in District Court—Public Demonstration.**

Where defendant complained of the action of the trial court in permitting the audience to applaud during the trial, etc., but the record showed that the court at once suppressed such applause, there was no error, although such matters should not occur.

**24.—Same—Argument of Counsel—Reversible Error.**

Where, upon trial of murder, defendant was convicted as an accomplice with a life sentence in the penitentiary, and the record showed that the district attorney had used improper argument of matters which were not admissible in evidence and which were clearly harmful to the rights of the defendant and were in no way explained, the same was reversible error.

Appeal from the District Court of Bee. Tried below before the Hon. Jno. M. Green.

Appeal from a conviction of murder as accomplice; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*J. Gus Patton* and *I. A. Patton* and *John Baker,* for appellant.—On question of conduct of district attorney: Hughes v. State, 62 Texas Crim. Rep., 288, 136 S. W. Rep., 1068; Tijerina v. State, 74 S. W. Rep., 913; Nix v. State, 74 S. W. Rep., 764; Wyatt v. State, 58 Texas Crim. Rep., 115, 124 S. W. Rep., 929.

On question of admitting in evidence the examining testimony of absent witness: Betts v. State, 65 Texas Crim. Rep., 358, 144 S. W. Rep., 677; Robertson v. State, 63 Texas Crim. Rep., 216, 142 S. W. Rep., 533; Ripley v. State, 58 Texas Crim. Rep., 489, 126 S. W. Rep., 586.

On question of argument of counsel: Davis v. State, 54 Texas Crim. Rep., 236, 114 S. W. Rep., 366; Taylor v. State, 50 Texas Crim. Rep., 560, 100 S. W. Rep., 393; Grimes v. State, 64 Texas Crim. Rep., 64, 141 S. W. Rep., 261; Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W. Rep., 328; Rutherford v. State, 67 S. W. Rep., 100; McMillan v. State, 65 Texas Crim. Rep., 319, 143 S. W. Rep., 1174; Rodriques v. State, 58 Texas Crim. Rep., 275, 125 S. W. Rep., 403; Calliham v. State, 150 S. W. Rep., 617; Smith v. State, 55 Texas Crim. Rep., 563, 117 S. W. Rep., 966; Tally v. State, 88 S. W. Rep., 339.

On question of public applause: Manning v. State, 39 S. W. Rep., 118.

On question of charge on self-defense: Sanchez v. State, 149 S. W. Rep., 124.

*C. E. Lane,* Assistant Attorney-General, for the State.—On question of argument of counsel: Felder v. State, 59 Texas Crim. Rep., 144, 127 S. W. Rep., 1055; Hatchell v. State, 47 Texas Crim. Rep., 380; Vann v. State, 48 id., 11.

PRENDERGAST, Presiding Judge.—Appellant was indicted by the grand jury of Goliad County in two counts,—one alleging that Elie Pointer murdered George Gosnell and that appellant was an accomplice thereto. The other that Pointer murdered Gosnell and that appellant was an accessory thereto. Both counts were submitted to the jury for a finding and appellant was found guilty as an accomplice with a life sentence in the penitentiary imposed as his punishment.

As this case will be reversed we will not discuss the evidence but will state it may have been sufficient to show: That the deceased's business was to dig canals, build dams and do such like work; that he was a married man, living with his wife, and that they had two children, one a girl about nine years, the other a boy, about seven years, of age. Gosnell's business and the location of his work required that he and his family live in tents near his work and that they did so at the time he was killed; that appellant was also a young man and married, but at the time of the killing and for some time prior thereto had been separated from, and was not living with, his wife; that he was an ordinary laborer doing such work as Gosnell's business called for; that a few months before the killing Gosnell had had appellant hired as a hand

and appellant had worked for him, boarding with Gosnell and his wife during such time; that for a few weeks just prior to the killing, and at the time thereof, appellant lived and worked and boarded some miles distant from where deceased and his wife and family were then living; that Elie Pointer was a young man, and at the time and for some time prior to the killing, worked for Gosnell and boarded with Gosnell and his wife, and that he and appellant were well acquainted with one another and were rather intimate with one another; that for some weeks, or perhaps, months, just before the killing, the appellant and Gosnell's wife became infatuated with one another and an illicit sexual intimacy existed between them whenever they could get the opportunity to indulge, and they were planning and scheming in various ways to get together as often as they could and thus indulge; that Gosnell was murdered late in the evening, or just about night, on Saturday, July 8, 1911, near his camp. The physical facts and the uncontradicted evidence show that he was shot with three balls in the back of the head behind the right ear and that his head was powder-burned from the shots. The physical facts and uncontradicted evidence further show that he was in his buggy at the time he was shot, and that the shooting and killing must have occurred at a somewhat secluded place not far from his tent, and that his body was taken in a buggy a circuitous route a distance of about a mile and a half into a bottom,—a secluded place, and thrown out from the buggy face downward. Either of the three shots in the back of the head were fatal. The buggy was tracked from where the shooting must have taken place by the blood running therefrom on the ground, this circuitous route of about a mile and a half to where the body was thrown out. Blood was all over and all in his buggy when it was found; that shortly before the killing the appellant called upon Mr. Bailey, one of his friends, and asked him if he could keep a secret and that he wanted to talk with him. He thereupon told Bailey, in effect, that he and Mrs. Gosnell wanted to get her a divorce from Gosnell, and wanted to know how much of Gosnell's property she could get, and that he was going to take Gosnell's wife away from him, Gosnell; that Friday morning before the killing, Gosnell, the deceased, had said Pointer to take him from his camp to the nearest railroad station some six or eight miles therefrom, and that the deceased that morning took the train at that point and went some miles distant on business to another point on the railroad, and that he was absent the balance of Friday, Friday night and until Saturday evening, when he returned to the railroad station and found Pointer there with his, deceased's, buggy and horse; that the appellant knew that the deceased would be away from his camp and wife Friday evening, that night, and not return thereto until Saturday, and that he, on Friday evening, went on the railroad to the same station where the deceased had taken the train, and got off at the train at that town, hired an automobile and, at his instance, was taken to a point in sight of and

very near the deceased's tent, telling, when he hired the automobile, to take him to Gosnell's camp, that he was going to Gosnell's camp; that when he and the parties reached a point in sight of and not far from Gosnell's camp, a woman (evidently Mrs. Gosnell) was seen in front of the tent and appellant and they waived at one another; that the appellant then told the parties not to take him nearer the camp, and that he then got out and they returned in the automobile; that he stayed with Mrs. Gosnell that evening, that night and until some time the next morning, Saturday morning, indulging their illicit sexual relations.  Knowing that the deceased would return to his camp some time Saturday, the appellant had said Pointer to take him, Saturday morning, to a point six or eight miles from this camp to said railroad station so that he would not be seen by deceased, and the deceased would not know that he had been to his camp and stayed with Mrs. Gosnell that night; that deceased reached the said town on the same train that the appellant boarded that day, Saturday, he getting on at a different point and different coach from where deceased got off, and getting on before the train stopped in such a way as to avoid the deceased seeing him.  The deceased that evening found said Pointer at said railroad station with his, deceased's, horse and buggy; that later in the evening said Pointer took deceased in the buggy back towards deceased's tent; that while at this town and before they left, the deceased drank intoxicating liquors to some considerable quantity, and become somewhat intoxicated, if not drunk; that said Pointer, as stated above, when they reached a point near deceased's camp, killed him and carried his body off and dumped it in the river bottom; that Mrs. Gosnell knew that Pointer had killed him immediately after he was killed; that she had one of their horses saddled and she took one of the children with her from there some mile, or such a matter, to a neighbor's, and that Pointer followed with the other child, and that she there advised Pointer to leave, furnished him a horse to leave on, and he did so that night.  She did not go to the body of her husband, nor attempt to find it.  The neighbors and other friends, having been informed of the killing during the night, went very early the next morning to hunt for the body and tracked it by the blood and buggy tracks, as stated above, from where the body was first shot and deceased killed to where the body was thrown out and sought to be hid; that appellant and Mrs. Gosnell had hired, or tried to hire, Pointer to kill the deceased Friday night and early Saturday morning, while they were together in their illicit relations; that upon Pointer leaving Mrs. Gosnell and the neighbors to which they had gone just after the killing, he went across the country that night some twenty miles or more to where appellant was, and at once hunted him up; that appellant the evening before, along about 4 or 5 o'clock Saturday evening, borrowed money from some different parties telling them that he had a friend who had gotten into trouble and that he wanted to furnish him the money so that the friend could leave; that he expected Pointer to take the train and meet him at another railroad station and

went to this latter station early that night expecting to meet Pointer soon after midnight, but the train came and Pointer was not thereon; that he and his companion then returned to his boarding house. Pointer, instead of catching the train, it seems, did not do so, but went across the country that night to where the deceased boarded, found him very early in the morning before or about daylight, awoke him and they at once went off together and remained in such a way as to keep out of sight during that day; that the appellant gave to Pointer the money he had borrowed and his watch and had him to leave and hid out. Either that day or the next day Pointer was apprehended and arrested at his hiding point. He had intended to make his escape therefrom but was apprehended before he could do so. On his person when arrested was found, among other things, appellant's watch. Appellant was arrested soon after Pointer was. In his valise in his boarding house were found some letters from Mrs. Gosnell to him which were clearly identified and introduced in evidence. One dated in June, 1911, and the other on July 4, 1911,—both in the most endearing terms, and tending to show most clearly the illicit sexual relations existing between them, and with other evidence, a motive by appellant to get rid of Gosnell.

Appellant has a large number of bills of exceptions and complaints of the proceedings on the trial. They relate to evidence admitted and excluded, to the manner of the examination of the witnesses by the district attorney, to questions by him to various witnesses, to his argument before the jury, to the charge of the court and to other matters. It will not be necessary to take up each of these separately. But we will discuss such of them as will be necessary to dispose of the questions raised, and likely to occur on another trial.

The same grand jury that indicted appellant also indicted Mrs. Gosnell, the wife of the deceased, for accomplice to the murder of her husband. The venue of both cases was properly changed from Goliad County to Bee County and the trial of appellant had in the District Court of Bee County in February, 1913.

The record shows that in their respective cases appellant and Mrs. Gosnell each made a motion to sever their trials and Mrs. Gosnell sought to have appellant tried first, and appellant sought to have her tried first; that they could not agree which should be tried first. Under the circumstances the court did not err in overruling appellant's motion to require that Mrs. Gosnell should be first tried, and, as the record and bill, as explained by the court, show that they failed to agree themselves, the court thereupon directed that appellant should be first tried, and, in addition, that if he had required Mrs. Gosnell be first tried, it would have resulted in the continuance of the appellant's case. The court followed strictly the statute in his action. C. C. P., arts. 727 and 728.

By one bill appellant complains that the court erred in overruling

his application for a third continuance. It is unnecessary to discuss this as this will not arise on another trial.

As stated in a bill, "to show the character of the defendant, to show his confidence in his cause, and further to show the treatment he received in jail," he complains that the court would not let him prove by the witness H. B. Hanley that while he was confined in the Goliad County jail he didn't take advantage of an opportunity to escape, but informed the officers, and wanted to prove the particulars of how the other prisoners escaped; that one of them was afterwards captured and sentenced to be hanged, and that thereafter the sheriff kept him in close confinement until he was transferred to Bee County. The State did not attempt to show flight by appellant, nor escape by him. If this had been sought by the State, then he could have proven that when he had an opportunity to escape from jail, he did not do so. But he could not prove the particulars he offered to prove, for the purpose stated.

As qualified by the court no error is shown by the district attorney asking the witness Hanley the question: "You take the same interest in bringing all criminals to justice, don't you?" .

What the witness Bego testified, to the effect, that a person of ordinary hearing could have heard the coming of an automobile from the point where they stopped to the tent of Gosnell, was admissible.

Appellant's next bill, as qualified by the judge, wherein he was cautioning the jury about their conduct during the trial, shows no error whatever.

The next bill, No. 7, sets out only and merely some questions that the district attorney asked certain witnesses, over his objections, some to the effect that they were leading questions, others to the response of the district attorney, when such objections were made and such like matters. None of these questions, nor any of this proceeding, were of such material nature as could have injured appellant's right. The court explains, in approving the bill, that in each instance he instructed the jury not to consider the remarks of the district attorney for any purpose and withdrew the same from the jury.

The State produced and thoroughly identified the written testimony of Pête Miller, taken on the examining trial of the appellant at which he was present, and heard the testimony, through his attorney, and cross-examined him at the time. The bill shows that when this was done the jury was retired and the court heard the examination of the witnesses for the purpose of determining whether or not said Miller was without the jurisdiction of the court in such a way as that this testimony could be admitted. The bill then shows, by question and answer, the testimony of several witnesses on the subject, and that none of this testimony went before the jury, but it was all before the court alone. One of the witnesses identified a letter which he had received from Miller from some foreign point, "St. Michael, Goren," dated October 14, 1911, in which he told the witness that he was still going

to sea; "I am not coming back until next year, and then I will stay for good." The indications by this was that he was then going from St. Michael, Goren, to sea. By the district clerk was produced a large number of subpoenas to various counties by both the State and the appellant, for this witness, all returned showing that the witness could not be found. One to Victoria County, the return of September 12, 1911, showed: "I have seen a letter signed Pete Miller and purporting to be written by this witness and in which reference is made to testimony of witness on examining trial of this case, stating that he was on his way to Hamburg, Germany, and in the future could be reached by letter addressed to him in care of C. C. Schneider." The return on another subpoena to Victoria County, under date of March 7, 1912, showed the process unexecuted; that he was informed the witness was now in France. The testimony of the sheriff of Victoria County showed that he had made every effort in his power to locate the whereabouts of this witness; that he had written and wired all over the country and that the witness was a fugitive from justice and that he had a warrant for him and had had for a long time and had made every effort to locate and arrest him. From all this testimony introduced before and heard by the judge, we think it justified his conclusion that the witness was beyond the jurisdiction of the court and not in the State, and he did not err in admitting the said testimony of Miller.

Of course, appellant's objection by another bill that this written testimony of said Miller was not admissible, because the clerk of the court had put his file mark and the date thereof on the back of this written statement, is not well taken; this could not have made the evidence inadmissible.

Appellant's next bill complaining of the questions and manner of examination by the district attorney of the State's witness George Simmons is quite meager. It is more in the nature of showing irritation by the district attorney to what he regarded as frivolous objections by the appellant's attorneys and the criticism of him by them, and his reply to the criticism, than anything else. The court instructed the jury not to notice side-bar remarks of the district attorney. The court should always, by whatever means is necessary, require attorneys for both sides to properly conduct examinations of witnesses, and not indulge in side-bar remarks. This cause of complaint will doubtless not arise on another trial.

By his next bill appellant complains that the court erred to his injury, which entitles him to a new trial, because he failed to instruct the jury at the noon recess on February 12th not to discuss the case among themselves; whereas, he had previously so instructed them at each of the other recesses. The qualification of the bill shows that when the jury was first organized, and at the first recess, he fully instructed them on this matter and that he repeated this from time to time, but seems to have omitted it at this particular recess. The court in his qualification, further says: "And the court being persuaded to

believe from the general conduct of the personnel of the jury throughout the long trial of this case that no lunatics or idiots had been selected on same, thought it unnecessary to go over the matter of fully instructing them on each occasion they were permitted to retire from the jury box, but was content to inform them that they were under the same instructions heretofore given them." Of course, this presents no error whatever.

By another bill, appellant complains that the court permitted proof to be made that the appellant's watch was found on, and taken off of, Pointer's person when he was arrested. This proof was admissible.

. Appellant objected to the witness Sherley Barber's statement that he tried to borrow money from Bailey. The court states, in his qualification of the bill, that the witness stated he was approached by appellant and requested by appellant to loan him $2; that the witness tried to get the money from one Bailey, and got it from Bailey and delivered it to defendant and that defendant stated that he wished to get the money to give to Pointer to help him off and did so. This testimony was admissible as qualified by the court.

By another bill, appellant complains of the introduction in evidence of the letters shown to have been found in appellant's grip, written to him and signed by Mrs. Gosnell. The court, in qualifying the bill, states that the grip or suit case, within two hours after it had been left by appellant at the house of Mr. Simmons, was taken charge of by the sheriff and afterwards claimed by and turned over to him as his property and that the letters were found in the grip when it was first taken possession of by the sheriff. The letters were clearly identified as letters from Mrs. Gosnell and they were addressed to and received by appellant. They were admissible.

Of course, there is nothing in appellant's objection to the introduction of these letters because they were read to the jury before the file mark of the clerk was put on them. Whether they had or had not such file mark could not affect their admissibility.

The State clearly proved that in the case against Elie Pointer, charged with the murder of Gosnell, he was duly warned, and made a written statement or confession about killing Gosnell. This written statement was produced, identified and introduced in evidence. It is very lengthy. We deem it unnecessary to copy it. In it Pointer admitted he killed Gosnell, but claimed he did so in self-defense. Appellant made these objections to its admission in evidence: 1. It is in violation of the Federal Constitution, which guarantees to every defendant the right to be confronted with the witnesses against him. 2. "It is in violation of the State Constitution and the Bill of Rights." 3. It is not the best evidence of Pointer's guilt, but the record of his conviction is the best. 4. It is largely hearsay. 5. It is vague, indefinite, unintelligible, the first and last part are contradictory, and its admission will be highly prejudicial to his rights. 6. It is admitted solely to show the principal's guilt, and is in violation of the Constitution as the principal's

guilt is part of the proof against him, and necessary to be shown before his guilt as an accomplice can be shown. 7. That the acts, declarations, and confessions of a co-conspirator, after the commission of the crime, are inadmissible against another co-conspirator. 8. That even though limited by the court solely to show the principal's guilt, it would be impossible to limit the same in the minds of the jury. 9. It is the unsworn statement in jail, with death staring him in the face, and he would tell anything to save his neck. 10. That the court refused to restrict and limit to that part only surrounding the actual killing and eliminate all hearsay. 11. It is read to the jury before being filed, and not filed till after it was read. These are all of his objections.

The court plainly, in his charge, told the jury, said statement or confession was admitted in evidence for the purpose of showing or tending to show that said Pointer killed Gosnell, and not to consider it for any other purpose. In approving appellant's bill, the court stated he so limited it.

In the trial of an accomplice it is necessary for the State to prove the guilt of the principal. Testimony which would be admissible against the principal, if he were on trial, is admissible against the accomplice when he is tried. This is the settled law. This court has uniformly held that the statement or confession of the principal is admissible against the accomplice. Thomas v. State, 43 Texas Crim. Rep., 20; Hamlin v. State, 39 Texas Crim. Rep., 579; Crook v. State, 27 Texas Crim. App., 198; Arnold v. State, 9 Texas Crim. App., 435; Cohea v. State, 11 Texas Crim. App., 622; Simms v. State, 10 Texas Crim. App., 131; Bluman v. State, 33 Texas Crim. Rep., 43. As limited by the court and the purposes for which the court admitted it, this statement was admissible.

By another bill appellant complains of the testimony of Dr. Chilton, that he made an examination of Pointer while he was in jail and that Pointer had one pretty bad lung and that he also examined his mental faculties and that in his mental faculties he could be influenced. It may be, in view of Pointer's claimed self-defense, testimony as to his physical condition was admissible, but not his mental condition showing he could be influenced.

The court did not err in excluding the hearsay testimony of Pointer's father as to the age of said Elie Pointer.

Appellant complains that the court would not let him prove by Lonnie Shelton, who was in jail at the time Pointer was, that he told her he killed Gosnell to get his money; that he thought he had about $600 when he killed him; that he turned his pockets all wrong side out and found he had no money. The court, in explaining this bill, when allowed, stated that Pointer's confession was not allowed or permitted in evidence, except as tending to show Pointer's guilty participancy in the killing and not as evidence against appellant. In our opinion this evidence was not admissible. Judge Davidson is of the opinion it was admissible in the attitude of this case.

Appellant requested the court to give this charge: "Gentlemen, you are further instructed that if you believe from the evidence beyond a reasonable doubt, that there was ever an understanding between Elie Pointer, Mrs. Gosnell and the defendant, Howard Millner, for the said Elie Pointer to kill the deceased Geo. Gosnell, but you have a reasonable doubt as to whether the said Elie Pointer killed the said Geo. Gosnell in pursuance of said common design, if any, or if you have a reasonable doubt as to whether the said Elie Pointer abandoned said common design, if any, and killed the said Geo. Gosnell from any other motive or reason, then in that event, you shall acquit the defendant."

The State, in making out its case, introduced testimony tending to show, and perhaps showing, that on Friday before Gosnell was killed late Saturday evening, when he left home, he had with him a check for $600 and that he tried to cash, and perhaps that day some time did cash, said check; that appellant and Pointer both at the time knew this; that when he was on his return home Saturday evening he is shown to have had some money with him and was paying for the treats in his drinking and that Pointer saw and knew this at the time, and that when the body of Gosnell was found early Sunday morning all of his pockets had been turned wrong side out, and his purse was found open with nothing in it, lying near his body.

Appellant contended, in effect among other things, that even if he had hired Pointer to kill deceased, yet, that that was not the reason Pointer killed him, but he did so for the purpose of robbing him and getting his money. Therefore, under the circumstances of this case the said testimony of Lonnie Shelton was admissible as original evidence and the court should have given, in substance at least, the charge herein above quoted which he refused to give.

The record shows that the court permitted defendant's witness Lonnie Shelton, or Smith, a negro woman, to testify that while she was in jail at the same time Pointer was, he told her that the said statement or confession hereinabove mentioned was all lies and not a bit of truth in it. Mr. Wharton in his work on Criminal Evidence, 10 Ed., vol. II, sec. 690, says: "Declarations made by a defendant in his own favor unless part of the res gestae, or of a confession offered by the prosecution, are not admissible for the defense. . . . Nor is the result changed by the statutes enabling a party to be called as a witness in his own behalf. That which he could prove by his sworn statements he is not permitted to prove by statements which are unsworn. In any view, therefore, the extrajudicial self-serving declarations of a party are inadmissible for him, with the exceptions hereafter stated, as evidence to prove his case." The exceptions mentioned by Mr. Wharton are in no way applicable in this case. All the text-books lay the law down substantially as does Mr. Wharton. The Supreme Court of our State, when it had criminal jurisdiction, in Jones v. State, 13 Texas, 176, said:

"The appellants asked the court to charge the jury, in effect, that if a confession of the accused was proven to have been made, at one time,

by one witness of the State, and proved to have been denied at another time, by another witness for the State, that one would destroy the other, and had, both, to be taken together. If this rule could be sustained, it would allow the accused to make evidence in his own defense. The rule is that a person's declarations or admissions shall be evidence against himself, but not in his own favor. There is, however, a qualification to this rule, and that is, that the confessions are not to be cut up, and a part only received, and that part against the accused; but that all that the party said, at the time of making the alleged confession, to qualify or explain it is to be received. It does not extend to what he may have said at another time." In 2 Enc. Digest of Texas Reports, Criminal, p. 565, the rule is thus stated: "It may be stated as a general rule, subject to a very few qualifications, that declarations, or admissions of a person charged with a criminal offense, are not admissible as evidence in his favor upon the prosecution for the offense, although they are admissible as evidence against him," citing a very large number of cases,—perhaps, as many as a hundred, of our Supreme Court and of this court in support of the rule stated. Certainly, if Pointer had been on trial such statement by him, attempted to be proved by said witness would not have been admissible as original testimony or otherwise in his behalf. Nor in this case could it be original evidence in appellant's behalf. It was not self-serving, but clearly hearsay. So that, on another trial, if objection is made to this testimony, it should be excluded. However, in the attitude of this case Judge Davidson is of the opinion this evidence was admissible. It is necessary for us to say what we have said on this subject because the record shows that the court permitted Davis and Willimen to testify that about the same time the witness Lonnie Shelton or Smith said Pointer had told her what is stated above, that he told them that his said statement, or confession, was absolutely true; and appellant complains that the court in his charge limited the effect of the testimony of Davis and Willimen to impeachment purposes alone of his said witness Lonnie Smith. Certainly, if the said testimony of Lonnie Smith was admissible, that of Davis and Willimen was also admissible, not only as impeaching Lonnie Smith, but as original evidence. Even if the court did limit the testimony of Davis and Willimen for impeachment purposes alone, this could not have been harmful to appellant, but was in his favor. Of course, if the testimony of said Lonnie Smith is excluded on another trial, that of Davis and Willimen also should be excluded. Then a charge on the subject at all could not and should not be given.

The evidence did not call for a charge that the witness Barber was an accessory. As the said statement or confession of Pointer was admitted solely for the purpose of showing or tending to show that he killed Gosnell and not as otherwise affecting appellant, and the court so charged at appellant's instance, the said statement or confession could not therefore be made the basis of a charge that, as the State

had introduced it, it was bound by it in the other matters and must be taken as true, unless the falsity of such other matters were shown by the State. The only question that could be made the basis of such a charge was that of appellant's self-defense and this was fully submitted to the jury by the court and found against appellant. The court's charge on self-defense presented the matter to the jury in accordance with the evidence, and appellant's complaint thereof that it limited Pointer's defense so as to exclude his apparent danger, is without merit.

Appellant has several bills of exceptions complaining of the action of the court in permitting the audience to applaud during the trial and in not suppressing it, etc. The court refused one of these bills, because what was stated in it was not true. Others he qualified by stating that at one time there was only a clap of the hands once which the court at once suppressed and stated to the 300 or 400 people present if the same occurred again the court would order the court room cleared. And that there were slight ripples of laughter which the court suppressed as quickly as could be done, and that one of appellant's counsel in his speech alluded to the Irish and especially to the district attorney an Irishman, as well as a witness, with the Blarney on his lips, in uncomplimentary terms which seemed to cause the complaint of the audience applauding, and that the court corrected and reprimanded the audience at once and threatened to have the court room cleared if it was repeated. Doubtless, on another trial such matters will be prevented by the court, so as to avoid any complaint.

By other bills appellant complains of various statements and arguments by the district attorney to the jury. It is unnecessary to take up separately these bills. One shows he stated the appellant had been hob-nobbing with the dead man's wife after the killing of George Gosnell. If on another trial there is no evidence to show this, this remark should not be made. Another, that he pointed his finger at appellant and called him a "scoundrel and villain and everything else." While appellant's conduct, shown by the evidence, may be severely commented on, personal epithets should not be used. Another, that he referred to the presence of Mrs. Gosnell as brazen effrontery since she has been here and that the defendant had not used her and had not shown where her children were. This was improper. Appellant could not have used her as a witness. Another, that he made this statement: "I wish I could tell you his remarks. (Pointer's just after the killing.) It is a pity for the State that I can not tell you the words that were said at the time Pointer and Mrs. Gosnell met after the killing, and it is a good thing for the defendant that I can't." This was especially improper and harmful to appellant. These bills were allowed by the court without any explanation or qualification thereof.

Of course, prosecuting attorneys, as well as attorneys for defendant, should have the right in their arguments to the jury to comment on the various witnesses, the weight to be given to their testimony, the conduct of the defendant, shown by the evidence, and such other

pertinent matters as the evidence justifies. However, they should stay within the record and not make damaging statements to the jury wholly outside of the evidence. The court has repeatedly been called upon to reverse cases because of the argument and statements by prosecuting officers before the jury, calculated to materially injure an accused and entirely outside of the record. Some of the above statements by the district attorney, we think, were especially harmful. So much so that we would be under the necessity of reversing this cause because thereof.

We deem it unnecessary to further specially discuss any other question. From what we have said in this opinion the court can be guided in another trial. For the errors above pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

DAVIDSON, JUDGE.—I concur in the reversal, and think there are other questions upon which the reversal should also have been predicated. If time affords from other work will file a few observations why I so believe.

DAVIDSON, JUDGE (partly concurring and partly dissenting).— When the opinion in this case was delivered I agreed to the reversal, and thought then and think yet there were quite a number of questions of a reversible nature besides those upon which Presiding Judge Prendergast reversed the judgment. The case is quite an interesting one and fully remarkable in some respects. The indictment contains two counts, one charging appellant with being an accomplice to the homicide, Elie Pointer being the principal in the killing; the other count charging that appellant was an accessory after the fact. Of course, this would render the case a very complicated one. There might be and perhaps was testimony introduced which tended to sustain or was offered to sustain the charge against appellant as being an accomplice, which was not admissible against him as an accessory, and there was testimony introduced against him as accessory, which could not be used against him as an accomplice. The charge does not sufficiently guard these matters nor was it in any way properly guarded against using this and other testimony improperly against the accused, but inasmuch as the conviction was on the count charging him as being an accomplice, the count with reference to his being an accessory passes out of the case, and doubtless will be properly guarded by the trial judge upon another hearing before the jury.

There was a very lengthy document introduced against appellant which is claimed to have been a confession written out and signed by Elie Pointer long after the homicide and while he was in jail. Pointer had been convicted and sent to the penitentiary for twenty years, and was in the penitentiary at the time of the trial of appellant. I am led to believe that he had been tried and convicted as a principal upon the theory that there had been a conspiracy between himself, appellant and

Mrs. Gosnell, though this is not clear. The State's case was dependent upon this theory against this appellant. Unless appellant was an accomplice, the State had no case against him. The State's case was dependent upon the fact that appellant was not present, and that he did not participate in the killing. This confession was quite voluminous, and went fully into details from Pointer's standpoint of the facts and circumstances connecting appellant, himself and Mrs. Gosnell with the conspiracy prior to the killing. Much of it, and in fact it seems the larger part of the confession, was directed at the part that he says appellant took in the conspiracy together with Mrs. Gosnell, giving many details, facts, circumstances, occurrences and conversations, etc., in which he states appellant participated. The court limited Pointer's confession in his charge to the jury to be used by them only against Pointer. He did not instruct the jury that they could not use it against the appellant, otherwise than by giving the general charge confining the jury in their consideration of the confession to Pointer. I am clearly of the opinion that the jury should have been guarded against using the expressions of Pointer connecting appellant with the matter, if the sole purpose in introducing the confession was to connect Pointer with the killing, using this as a means of showing that he was the principal in the homicide. Pointer stated also that he killed deceased Gosnell in self-defense. The court gave a general charge on self-defense, but did not limit it or apply it to the facts of this case. The jury should have been pointedly instructed that if Pointer killed the deceased in self-defense, they would not use the evidence of the conspiracy set out in Pointer's confession. Again, inasmuch as the State used Pointer's confession connecting the defendant and giving details, they should have been pointedly further instructed that the burden of proof was on the State to show that Pointer did not kill the deceased in self-defense as he stated, and that in no event could they use Pointer's statement against appellant connecting him with the conspiracy or the homicide. While it may be, under the authorities, that the confession of Pointer might be used to show that he killed the deceased, it could not be used to connect the defendant with it in any way. The acts, declarations or statements of a co-conspirator can not be used against another co-conspirator if made after the termination of the design of the conspiracy. This is so under all the authorities. This matter underwent a very thorough examination in Cox v. State, 8 Texas Crim. App., 254. It is the universal rule in Texas by all decisions of this and all the courts. I express the opinion as being correct here now, that only that part of the confession which connected Pointer with the killing should have been permitted to go to the jury, and all that he said in his confession with reference to appellant being connected with the conspiracy should not have been permitted to go to the jury. Some of these matters were urged upon the trial and are found in the record in objections not only as to the testimony but as to the charges given and refused. I do not care to go into any detailed statement of these matters. The trial court

will understand my views upon the matter without going into those details.

Another question in this connection is, that subsequent to the making of the confession by Pointer, appellant proposed to show that Pointer admitted that his confession was a falsity.   I do not purpose to repeat the offered testimony.   That is the substance and concrete conclusion of the offered testimony.   Pointer also stated that he killed deceased for the purpose of robbery, and that he expected to get six hundred dollars from him, giving facts and details, etc.   This testimony ought to have been permitted to go to the jury in the attitude in which this matter was presented.   My brethren seem to take the view of it, in the opinion written by our Presiding Judge, that these were self-serving declarations on the part of the defendant, and quote authorities to show that self-serving declarations could not be used to contradict Pointer's confession.   In my judgment they mistook the whole issue and did not comprehend the question made by appellant and his counsel,  If these had been declarations of the defendant himself to meet his (defendant's) confession, there might have been some cogency in the view advanced by the majority opinion, but Pointer's confession was used as evidence against the defendant and stood in the case against him.   The statements of Pointer were not eliminated as to the defendant by the charge or by any sort of means on the part of the trial court; all went to the jury, and taking as a basis this confession, other evidence was permitted to be introduced to corroborate Pointer's confession.   Under this view of the matter and as it was presented to the jury, defendant clearly had the right to show Pointer's subsequent statement was false.   These statements impeached Pointer's confession and were admissible for that purpose.   Pointer's confession was very damaging to go before the jury unchallenged and uncautioned as to its effect and being before the jury, appellant had a right to show, in any way he could, that Pointer had made false statements.   This could be done by Pointer's admission that his confession was false.   The delicacy of matters of this sort will be readily perceived by a legal mind in a complicated case where the guilt of the principal as well as the guilt of the accomplice must be shown during the same trial.   Testimony admissible only against the principal should not be used against the accomplice.   If Pointer was not guilty of killing deceased in accordance with a conspiracy, appellant could not be responsible for the homicide, nor would he be responsible unless the conspiracy was shown between Pointer, appellant and Mrs. Gosnell.   This was the basis of the prosecution, and necessarily must be the basis of a conviction.   If Pointer killed the deceased in self-defense, or for the purpose of robbery, and not at the instigation of appellant, then appellant would not be guilty; and while under the cited authorities Pointer's confession might be used before the jury to show his, Pointer's, guilt, it could not be used to show the guilt of appellant as an accomplice; nor could any of the declarations that he made in his confession with reference to the defendant be used, but

the court did not so instruct the jury, and they were permitted to go before the jury, and, therefore, appellant was entitled to show Pointer's subsequent statements that his confession was false. This is the rule in dying declarations under all the authorities, and it is also the rule in reference to confessions. These matters have undergone quite elaborate investigations in the decisions of this court. I deem it unnecessary to cite those cases. The statements on the part of Pointer connecting appellant with it as found in the confession could not be used against the apppellant, and the introduction by appellant of Pointer's subsequent denial of the truth of the confession and admission that it was false could not be considered as self-serving so far as defendant was concerned. The interweaving of testimony in a case like this, where the guilt of the principal and the accomplice must both be shown, is on most delicate lines, and unless the jury is properly guarded in reference to the use of this character of testimony, it will be impossible for the accomplice to have a fair trial. They would attribute to the accomplice the statements and confession by the principal made long subsequent to the homicide as indicative of guilt of the accomplice. The cases cited by the majority opinion do not touch the question. I do not propose to pursue this question further than to add that appellant has the legal right to defeat the State's case against the principal by any testimony that will tend to do so. If Pointer was not connected with the killing as alleged, or if he killed, the State must show his guilt as alleged, otherwise appellant should be acquitted. He had the right to attack the State's case against Pointer, for it was necessary to prove Pointer's guilt as a step in appellant's prosecution.

There is another question in this case of far reaching importance sustained by my brethren, from which I most earnestly dissent. The testimony of a witness named Pete Miller was reproduced before the jury. There was no affidavit made under the statute by any one showing the absence of the witness, and to that extent there was no predicate laid or offered to be laid. Article 833 of the Revised Code of Criminal Procedure (1911) reads as follows: "When the deposition is sought to be used by the State, the oath prescribed in the preceding article may be made by the district or county attorney, or any other credible person; and, when sought to be used by the defendant, the oath shall be made by him in person." With reference to article 832, it is therein provided, that depositions taken in criminal cases shall not be read, unless oath be made that the witness resides out of the State; or, that since his deposition was taken, the witness has died; or that he has removed beyond the limits of the State; or that he has been prevented from attending the court through the act or agency of the defendant; or by the act or agency of any person whose object was to deprive the defendant of the benefit of the testimony; or that, by reason of age or bodily infirmity, such witness can not attend. For collation of the authorities on insufficient predicate see Branch's Crim. Law, sec. 326. The bill of exceptions recites, and I am following the bill of exceptions in passing

upon this question, as follows: "The proof as introduced before the court in the absence of the jury shows that Pete Miller was going by the name of Pete Shirra, and that the State was aware of such fact, and made no attempt to locate him by said name. That the State has shown no diligence to get him by the name of Pete Shirra whatever. The statement is further inadmissible because defendant was not present at the time it was made. I do not care to state now the grounds of objection; they are rather fully stated in the majority opinion. The evidence introduced in this connection as shown by the bill may be stated as follows: Hoff stated that he lived at Fannin, Goliad County, Texas, and held the office of justice of the peace, and was holding that office on 19th of July, 1911; that he was both justice of the peace and commissioner, and presided at the examining trial of the parties. He was introduced mainly to show the fact that he held the examining trial, and that Pete Miller testified on that trial, and the testimony was reduced to writing. The district attorney then proposed to introduce a letter and card. One of appellant's counsel requested the jury to retire, which was done. The following letter was then read:

"St. Michael, Goren, Okt. 14, 1911.

Dear Friend:

I will let you know that I am still going to sea and feeling fine hope you are all well. I am not coming back until nect year, and then I will stay there for good George how is that trial coming off and hos deed Howard and Ely Pointer come out, let me know. I have two letters written to you and no answer to any. My name is still the old one. Write me as soon as possible. Best regard to all of you. Tell Ella how the for me. George, tell my little girl how the. You know what I mean. Your friend, Pete Miller."

Then further continuing the district attorney said: "I want to know if you recognize that as being the handwriting of Pete Miller?" He answered in the affirmative, but stated that that was all the correspondence he had ever had with him. When asked what efforts had he made to locate the whereabouts of Miller, he said he wrote to that address but had never received a reply. Being cross, he was asked this question: "I will ask you if that is not the handwriting of Pete Miller, and you are prepared to swear it is; you say you are familiar with his handwriting? A. Well, it looks like it. Q. Compare that with this, is that the same handwriting as this, is that as familiar as the other? A. It is not the same. Q. Don't you know Mr. Simmons, as well as you are sitting there that that postal card and letter is not written by one and the same party? A. I can't say. Q. You don't know it? A. I don't think it is. Q. You say you are familiar with the handwriting; which one do you claim to be the handwriting you are familiar with, the postal or this? A. I suppose this is it. Q. And this here is something else; it is not his hand-

writing? A. I don't know whether it is or not. Q. Are you prepared to say under oath that was the handwriting of Pete Miller? A. No, sir, I can not swear to it, I know it was mailed to me. Q. I will ask you another question; who is Pete Shirra? A. Supposed to be Pete Miller. Q. He has another name he goes by? A. Not that I know of; Pete Miller and Pete Shirra." He further testified he did not know whether Pete Miller got mail under the name of Shirra or not.

Partain testified: "Some of these are subpoenas issued out of the District Court of Goliad County, and transferred here with the papers on the change of venue." He then enumerates a subpoena to Harris County for Pete Miller, issued the 6th day of September, 1911, out of the District Court of Goliad County, returned: "Came to hand on 8th day of September, 1911. Not executed to Pete Miller after due search and diligent inquiry could not be found in Houston, Harris County, Texas." Subpoena issued on 12th day of September, 1911, to Victoria County, with return "Came to hand the 12th day of September, 1911, returned" but further "I have seen a letter signed Pete Miller and purporting to be written by this witness and in which reference is made to testimony of witness on examining trial of this case stated that he was on his way to Hamburg, Germany, and in the future could be reached by letter addressed to him in care of C. C. Schneider." That return was dated the 12th of September, 1911. A telegram from A. R. Anderson to the district clerk of Goliad County, Texas, is as follows: "Humble, Texas, 9-15-11. R. P. Appleby, Goliad, Texas. Pete Miller can not be found in Harris County, Texas. A. R. Anderson, Sheriff, Harris Co., Texas." On 6th of March, 1912, subpoena was again issued to Harris County, but returned not executed. On 7th of March, 1912, another subpoena issued to Harris County, returned not executed because witness could not be found in that county. Subpoena to Victoria County returned unexecuted. This subpoena was issued March 7, 1912. On 8th of August, 1912, subpoena issued to Galveston County; witness could not be found. On 26th February, 1913, subpoena issued to Jefferson County, and returned unexecuted; witness could not be found. Four of these subpoenas were issued by the State and three by the defense. Weisiger, sheriff and tax collector of Victoria County, testified that "I have made every effort in my power to locate the whereabouts of the witness Pete Miller who has been summoned as a witness in this case. I have written and wired all over the country, every place I could hear of. I will go further. He is a fugitive from justice. I hold a warrant for him and have been unable to serve it. I have written to the sheriffs of the various counties, Houston, Galveston and Dallas, and also to the sheriff of Lake Charles, Louisiana, and wired them, sent them a capias for him to these different places." He says he "did not know this man had two names, Pete Miller and Pete Shirra. He is a fugitive from justice on a charge of carrying a pistol."

Defendant further excepts to the introduction of said testimony because the State had in their possession a letter they knew was signed

by Pete Miller, alias Pete Shirra, and have made no effort to locate
said witness Pete Shirra whatever.

Because further, said letter shows on its face that he said he would
be back in a year, and the presumption is that said witness is now
within the jurisdiction of this court. The latest date he states he would
be away is September, 1912, and the presumption is that he is now
within the jurisdiction of the court living under his alias of Pete
Shirra, and because said letter states that he would be back at a certain
address, and there is no showing that the State tried to locate said
witness at said address given in the letter. The trial court says: "This
is a very serious proposition. It will be going one step further than
the higher courts have gone, but I am going to let you introduce it,
Mr. Morris" [Morris is district attorney]. "The objection is overruled."
The further objection was made that appellant was being tried for
murder in the examining trial, and is now being tried as an accomplice
to murder and accessory to murder. Then follows the testimony of
the absent witness, with all sorts of objections urged to its admission.
It was admitted in evidence.

I am of the opinion that the trial court was correct when he stated
this: "It will be going one step further than the higher courts have
gone," in admitting the reproduction of testimony on such a predicate.
It is going far beyond anything this court has heretofore sustained as
being a sufficient predicate. The authorities are collated in Mr. Branch's
Crim. Law, sec. 326. Predicates stronger than that set out in bill of
exceptions were held insufficient in many cases. See Evans v. State,
12 Texas Crim. App., 370; Pinkney v. State, 12 Texas Crim. App., 352;
McCollum v. State, 29 Texas Crim. App., 162; Parker v. State, 24
Texas Crim. App., 61; Smith v. State, 48 Texas Crim. Rep., 65; Nixon
v. State, 53 Texas Crim. Rep., 325. All of these cases were where the
predicate was sought to be shown by removal of the witness from the
State. It was held in Cooper v. State, 7 Texas Crim. App., 194; Post
v. State, 10 Texas Crim. App., 579, and Menges v. State, 21 Texas
Crim. App., 413, that proof merely that a witness is absent from the
State is not a sufficient predicate. It was held in Martinas v. State,
26 Texas Crim. App., 91, that the affidavit of State's counsel that absent
witness had been absent from the county for a year, that attachment
had been issued to every county in the State and returned not executed,
and that affiant believed witness to be absent from the State, is not
a sufficient predicate. It was also held in Smith v. State, 48 Texas
Crim. Rep., 65, and Ripley v. State, 58 Texas Crim. Rep., 489, 126
S. W. Rep., 586, that proof that the absent witness had left saying
he was going to another State, and that a subpoena had been issued
and returned not executed, is not a sufficient predicate. Where the
witness was shown to be out of the State two years before the trial, but
there was no proof of his whereabouts at the time of the trial, and
there was no proof that the same person named in the affidavits of non-

residence was the same person who had formerly testified, predicate was not sufficient. Proof that after diligent inquiry the witness could not be found, nor his whereabouts ascertained, is not sufficient predicate, citing Evans v. State, 12 Texas Crim. App., 370. Declarations of a witness that he was going out of the State is not sufficient to show that he had in fact gone, and that he had removed or resided beyond the limits of the State. Parker v. State, 18 Texas Crim. App., 72. It was again held in Scruggs v. State, 35 Texas Crim. Rep., 622, that letters from a third party in another State, mentioning the presence there of the absent witnesses, are only hearsay.

It will be noticed that the predicate laid or sought to be laid in this case was based on a letter which had been written from St. Michael, Goren, Okt. (whatever it may mean) 14, 1911. We suppose that "Okt." means October. This letter purported to be signed by Pete Miller, and was addressed to "Dear Friend." In this he says, "I will let you know that I am still going to sea and feeling fine; hope you are well. I am not coming back until next year, and then I will stay there for good. George how is that trial coming off, and how did Howard and Ely Pointer come out, let me know." This letter, it seems, was written October 14, 1911, from St. Michael, Goren. There is nothing to show where St. Michael, Goren, is, whether it is in or out of Texas, and no attempt to locate the place. Partain testifies he had seen a letter signed Pete Miller purporting to be written by this witness, stating that he was on his way to Hamburg, Germany, and in the future could be reached by letter addressed to him in care of C. C. Schneider. This also seems to have been some time in the year 1911. This conviction occurred on March 10, 1913. There is nothing to indicate that the absent witness wrote the letter which states he was going to Hamburg, Germany, except that it purported to be signed by him. No evidence is introduced that he wrote the letter or signed the letter. No witness was introduced to identify his handwriting. Then taking the testimony of the different witnesses as to the process issued, it does not show under our authorities that any legal diligence was used as a predicate for the introduction of this testimony. The idea that a man was a fugitive from justice on account of a pistol case and ran away from the State to go to Hamburg, Germany, or anywhere else, would hardly be plausible. The process was confined, it seems, to seven subpoenas, four by the State and three by the defendant to find this absent witness, and they were confined to just a few counties. Where Sheriff Weisiger wired and to whom is not shown except in a general way that it was to the sheriffs, and one telegram sent to Lake Charles, Louisiana. This predicate is so utterly incompetent that I do not understand how it could form the basis for the reproduction of the testimony of the supposed absent witness. The trial court was not only right in saying that this was going beyond what the appellate courts had heretofore held, but is getting far beyond all the authorities, and does not even indicate that the witness was out of the State. He may have been out of Texas,

but that is not shown. The law requires that he must be out of the State at the time the testimony is offered.

There is another question: The court instructing the jury on self-defense burdened the charge with the relative strength of the parties, etc. Under our authorities this is error. There are quite a number of cases laying down this proposition, and sustaining appellant's objection to the charge on this ground.

The court charged the jury that certain testimony was admitted for the purpose of "impeaching the evidence" of a certain witness. Under all the authorities this charge is not sufficient. Testimony of this character is introduced for the purpose of affecting the *credibility* of the witness and the *weight* to be given his testimony. These distinctions have been drawn in the opinions, and it is unnecessary to refer to them further, or to cite the cases.

There are other questions of more or less moment that would justify review and criticism, but they are covered in the main by what I have said heretofore with reference to the confession of Pointer, and evidence of that character which was introduced to sustain the guilt of Pointer and could not be introduced to show the guilt of the accused as an accomplice. In a general way, I will again suggest this, that where a party is charged as an accomplice to a principal in a murder case like this, the testimony should be guarded very closely by the court in handling the case before the jury, to the end that the testimony used only to show the guilt of the principal can not be economized or used to show the guilt of the accomplice; that is, where testimony is introduced for this purpose the jury should be carefully guarded so they will not use it and may not use it against the accomplice. It will be understood since the rendition of the Carlisle case, 31 Texas Crim. Rep., 537, that the accomplice, if guilty at all, is guilty of the homicide by reason of the statutory requirements, and that these statutory matters must be fully met. The crime of the accomplice is a compound offense, but in its final analysis the accomplice would be *guilty of homicide* by reason of his prior acts connected with the principal or connecting himself with the principal. He would be guilty of murder by reason of acts denounced by statute, and by statute only.

While agreeing with the majority of the court in reversing the case, I am fully persuaded under the authorities and under the law, appellant was entitled to a reversal for the reasons I have stated above, and my brethren in reversing the case should have included in that reversal the matters they have held not erroneous. They are clearly in error under all the law as I understand it in Texas, and with reference to the predicate for the reproduction of the testimony of Pete Miller, the trial court himself in the bill of exceptions recognized the fact that he was in error and had gone beyond what the law was then held to be.

Concurring in the reversal, I most respectfully dissent from the ruling of my brethren holding the other matters were not error.