Jerry Joe BIRD, Appellant,

v.

The STATE of Texas, Appellee.

No. 61832.

Court of Criminal Appeals of Texas,
En Banc.

May 1, 1985.

Rehearing Denied July 10, 1985.

Douglas Tinker, Corpus Christi, for appellant.

Selden N. Snedeker, Dist. Atty. and James R. Mardis, Asst. Dist. Atty., Brownsville, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder in which the death penalty was imposed after the jury affirmatively answered the special issues submitted under Article 37.071, V.A.C.C.P. See V.T.C.A., Penal Code, § 19.03.

Appellant's previous conviction for this offense was reversed because the prosecutor in jury argument commented on appellant's failure to testify. *Bird v. State*, 527 S.W.2d 891 (Tex.Cr.App.1975).

On appeal this time the appellant complains of the admission into evidence of a handcuff key, the failure of the trial court to grant his motion for change of venue when the State filed no controverting affidavits and because of prior publicity, the action of the court in permitting the bolstering of testimony of the deceased's widow, and in permitting the widow's testimony from the prior trial to be read into evidence in lieu of her personal appearance, the failure of the court to permit evidence at the guilt stage of the trial of appellant's opportunities to escape jail when he did not do so, the failure of the court to quash the indictment because of the ethnic makeup of the grand jury, the improper excusal of venireman Lewis and the failure of the court to grant a mistrial when the district attorney offered the jurors an opportunity to come to his office for coffee just prior to deliberations.

The sufficiency of the evidence to sustain the conviction is not challenged. A brief recitation of the facts is set forth in the previous opinion, *Bird v. State*, supra. Suffice it to say the record shows that on the night of January 11, 1974, two men appeared at the home of Victor and Jo Ellen Trammel in Cameron County. They gained entrance on the pretense that they had some guns for Mr. Trammel to consider purchasing. Jo Ellen Trammel identified the men as appellant Bird and his companion Korges. Trammel stated he did not desire to purchase any guns but would look at the guns. At this point appellant Bird displayed a pistol with a silencer attached. The pistol was then handed to Korges. The Trammels were informed they were being robbed.

Trammel was forced to open safes containing a large collection of antique guns. The couple was handcuffed, bound with tape and placed in separate bedrooms. Jo Ellen Trammel was given an injection to put her to sleep. She related the drug did not take effect but she feigned sleep. Later she heard a muffled shot and a "terrible groan that led me to believe that they had shot Mr. Trammel." She slipped one hand out of the handcuffs, untaped herself and crawled out a window. She ran through a plowed field and hid in a drainage ditch. After some time elapsed, she smelled smoke, but did not leave her hiding place until she heard fire engines approaching. The Trammel house was on fire. After the fire was extinguished, Vic Trammel's body, badly burned, was found inside the house. Among other things, his very valuable gun collection was missing. The doctor who performed the autopsy was unable to say whether Trammel's death was due to the two bullet wounds in his body or resulted from the fire, but theorized that Trammel had been shot first and that such wounds would have been fatal.

After an investigation, appellant and Korges were arrested. Harvey Lee Palmer was also arrested when it was learned that he was in possession of guns and

other items taken from the Trammel house as well as a small bag containing handcuffs and tape. Palmer, a State's witness, testified appellant requested he store these goods.

At the scene Texas Ranger Bruce Casteel found two empty Coleman fuel cases and a .22 caliber semi-automatic pistol with a silencer attached.

In two grounds of error appellant contends the trial court erred in failing to change venue when no controverting affidavits were filed by the State, and where because of prior publicity he could not receive a fair trial in Cameron County.

Appellant first argues that after he filed his motion for change of venue supported by affidavits as required by Article 31.03, V.A.C.C.P., he was entitled to a change of venue as a matter of law when the prosecutor failed to file controverting affidavits. He relies upon *Flores v. State*, 493 S.W.2d 785 (Tex.Cr.App.1973); and *Wall v. State*, 417 S.W.2d 59 (Tex.Cr.App.1967). See also *Durrough v. State*, 562 S.W.2d 488 (Tex. Cr.App.1978); *Stapleton v. State*, 565 S.W.2d 532 (Tex.Cr.App.1978).

When appellant's motion for change of venue was filed, it was not supported by affidavits as required. See Article 31.03, supra. The deficiency was pointed out, and over objection the court gave appellant time to secure the necessary affidavits. These affidavits were not filed until the hearing on the motion. Until that time the State had nothing to controvert.

Immediately prior to the hearing on the venue motion appellant's counsel stated:

"I don't have any objection to the court considering the Motion for Change of Venue as though a controverting affidavit has been filed by the District Attorney's office."

At the hearing four members of the news media testified under oath that in their opinion that appellant could get a fair trial in Cameron County. The sworn testimony controverted the affidavits filed by appellant.

A properly filed and supported motion for change of venue must be granted as a matter of law unless, the State files a controverting affidavit (Article 31.04, V.A. C.C.P.), the defendant waives the necessity of a controverting affidavit or a hearing is held and evidence presented on the issue. *McManus v. State*, 591 S.W.2d 505, 516 (Tex.Cr.App.1979); *McBrayer v. State*, 504 S.W.2d 445 (Tex.Cr.App.1974).

In *McManus* this Court wrote:

"When there is no issue of fact to be determined by the trial court, and no place for its exercise of discretion, it must grant the defendant's motion. *Durrough v. State*, 562 S.W.2d 488 (Tex. Cr.App.1978). This is the reason it is stated that in this situation a defendant is entitled to such change as a matter of law.

"However it is clear that a defendant may waive his per se right to a change of venue. If the State has filed no controverting affidavit, and the defense proceeds to a hearing without objecting that there is no issue of fact to be tried and that he is thus entitled to the change as a matter of law he waives his right to the per se change of venue. *Puryear v. State*, 510 S.W.2d 356 (Tex.Cr.App.1974); *Lewis v. State*, 505 S.W.2d 603 (Tex.Cr. App.1974); see also *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App.1978) (footnote # 9). Where the defendant, without such objection, allows the trial court to hear the merits of the issue and to thus exercise its discretion in determining the issue of fact, he cannot thereafter argue that no issue of fact was raised and that he was entitled to the change as a matter of law." Cf. *Wall v. State*, 417 S.W.2d 59, 63 (Tex.Cr.App.1967).

Under the circumstances presented appellant was not entitled to a change of venue as a matter of law.

Appellant also advances the claim that as a result of publicity he could not get a fair trial in Cameron County. The appellant directs our attention to numerous exhibits including newspaper clippings and television news transcripts, etc., but does

not brief the contention or organize the evidence to support his assertion. We have examined the evidence and find most of the publicity refers to the prior trial three years before. We have also examined the voir dire examination of the jury panel. We cannot conclude the court erred in refusing to grant the motion for change of venue.

Appellant argues in four grounds of error that a handcuff key, State's Exhibit No. 59, was improperly admitted into evidence because the chain of custody had not been properly laid, that the admission was in violation of the granted motion to suppress evidence, that the prosecutor had agreed evidence seized as a result of appellant's arrest would not be introduced, and that the trial court and appellant were misled by the prosecutor's misconduct.

Ranger Casteel detailed the steps of his investigation. He stated that the day after appellant was booked into the Cameron County jail he had gone to the jail to examine appellant's property inventory, and among the property had found a handcuff key. When the key was offered, appellant's counsel took Casteel on voir dire examination. It was established that Casteel was present when appellant was arrested in Corpus Christi, but other officers took him to the Corpus Christi city jail. Casteel was not present at the booking but knew that the city jail had a booking procedure where a prisoner's property would be inventoried. Casteel later transported appellant and a bag containing his property to Cameron County. He did not examine the property in the bag. After taking appellant before a magistrate in Cameron County, appellant was released to other officers who took him to the Cameron County jail. Casteel was not present at the booking, and did not come to the jail until the following day. It was then he found the key among appellant's property which had been kept in a cabinet or lock box. On voir dire examination he acknowledged that law enforcement personnel often have handcuffs and keys there, that appellant had been

booked into two different jails and his property handled by different law enforcement personnel. Casteel testified appellant's other property, including the knife which the parties agreed to admit, was listed on the back side of the booking card or sheet while the handcuff key was listed on the front side. Appellant's counsel attempted to show that appellant had "signed for" the items on the back side but not the key. The record then reflects on voir dire examination of Casteel:

"Q But this shows he didn't have it (key) when he came in?

"A That is what it shows on the back, sir. That is correct." [1]

After the voir dire examination, appellant's counsel stated:

"I do object to the introduction."

The prosecutor argued that whatever was shown by the evidence went to the weight, not the admissibility of the exhibit. The record then shows:

"MR. TINKER (Defense Counsel): Your Honor, the predicate has not properly been laid for its admissibility. I object to it for that reason, and I will abide by whatever ruling the court gives."

The exhibit was then admitted into evidence. At no time was there an objection that there was a violation of the granted motion to suppress or the key was an item the prosecutor had agreed not to introduce, etc.

Prior to trial the appellant filed a motion to suppress items seized from him at the time of his arrest. The items were not mentioned in the motion. Subsequently at a pre-trial hearing appellant's counsel pointed out that at the prior trial the items had not been introduced. The court instructed the prosecutor not to offer such evidence at the trial on the merits until there had been a hearing outside of the jury's presence. The prosecutor agreed. This was repeated at another pre-trial hearing and appellant was told to re-urge his motion to suppress if necessary. Later at

1. The booking sheet was never introduced.

still another pre-trial hearing appellant re-urged his motion to suppress stating the prosecutor had agreed not to introduce such evidence. The motion to suppress was then granted without a hearing. There was no listing or mention of the items involved.

The only objection offered when the key was offered was that the proper predicate had not been laid. Under *Harris v. State*, 565 S.W.2d 66 (Tex.Cr.App.1978), such objection was held to be too general to preserve error. See *Boss v. State*, 489 S.W.2d 582 (Tex.Cr.App.1973); *Bennett v. State*, 394 S.W.2d 804 (Tex.Cr.App.1965). See also *Zillender v. State*, 557 S.W.2d 515, 517 (Tex.Cr.App.1977). Counsel must inform the court just how the predicate is deficient. Nothing appears to be presented for review.

On appeal appellant initially contends the proper chain of custody of the key was not shown. He did not so inform the trial judge this was the basis of any objection. Appellant did try to leave the inference the key was not among the belongings when he was booked into jail, and that law enforcement personnel at the jail had handcuffs and keys. There was no issue of tampering established. Thus an objection that the State has failed to establish the proper chain of custody goes to the weight of the evidence rather than its admissibility. *Parr v. State*, 606 S.W.2d 928 (Tex.Cr.App.1980); see generally, *Wilhoit v. State*, 638 S.W.2d 489, 494 (Tex.Cr.App. 1982); *Binyon v. State*, 545 S.W.2d 448 (Tex.Cr.App.1976); *Greer v. State*, 523 S.W.2d 687 (Tex.Cr.App.1975); *Pringle v. State*, 511 S.W.2d 35 (Tex.Cr.App.1974); *Norris v. State*, 507 S.W.2d 796 (Tex.Cr. App.1974); *Salinas v. State*, 507 S.W.2d 730 (Tex.Cr.App.1974); *Bueno v. State*, 501 S.W.2d 339 (Tex.Cr.App.1973).

Taking a different tact, appellant also urges the court erred in admitting the key because it was in violation of the granted motion to suppress and the prosecutor's agreement not to introduce items seized at the time of the arrest. As earlier noted, appellant did not object on this basis at the time the key was offered. Appellant seems to argue, somewhat inconsistently with his earlier contention, that the key was seized at the time of his arrest and was among his property at all times and that it was part of the evidence suppressed. The difficulty is that the record does not show what items were seized at the time of the arrest. The trial court was never made aware of appellant's contention, and there is no showing that the prosecutor acted in bad faith.

We conclude that if there was any error it was waived.

If it can be argued there was error which was not waived, it must be remembered that in determining whether there was harmful error in admitting improper evidence, the facts and circumstances of the individual case must be considered. *Bass v. State*, 622 S.W.2d 101, 104 (Tex.Cr.App.1981); *Ex parte Flores*, 537 S.W.2d 458 (Tex.Cr.App.1976). Where there is not a reasonable possibility that improperly admitted evidence has contributed to a defendant's conviction, reversal is not required. *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981), *cert. den.* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169. See also *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the Court wrote:

"In this case we conclude that the 'minds of an average jury' would not have found the State's case less persuasive had the testimony ... been excluded. The admission into evidence of these statements, therefore, was at most harmless error."

The evidence of appellant's guilt was overwhelming. Jo Ellen Trammel identified him as one of the men who entered the house and handcuffed her and her husband. Stolen property was recovered at a place where appellant was said to have stored it. Also recovered was a bag containing handcuffs and tape. The brand, make, or model of the handcuff key was

never shown. No evidence was presented that the key fit handcuffs recovered or those taken from Jo Ellen Trammel's wrist. We find the State's case would not have been less persuasive if the handcuff key had not been admitted into evidence. The error, if any, was harmless error beyond a reasonable doubt. It did not contribute to the conviction. See *Jackson v. State*, 548 S.W.2d 685 (Tex.Cr.App.1977); *Clay v. State*, 518 S.W.2d 550 (Tex.Cr.App.1975); *Bridger v. State*, 503 S.W.2d 801 (Tex.Cr. App.1974); *Cole v. State*, 484 S.W.2d 779 (Tex.Cr.App.1972); *Holcomb v. State*, 484 S.W.2d 929 (Tex.Cr.App.1972). Appellant's contentions concerning the handcuff key are overruled.

Appellant also contends the trial court erred in allowing the prosecution to bolster the testimony of Jo Ellen Trammel by eliciting from Ranger Casteel that he showed Mrs. Trammel a photographic spread and soon thereafter arrested appellant and his co-defendant.

Prior to the time Mrs. Trammel's testimony from the previous trial was read to the jury, Ranger Casteel testified for the State. He detailed his investigation of the alleged offense. He arrived at the scene and talked to Mrs. Trammel and got a description of the men involved. He later talked to her again in the hospital and sent out a teletype. In response he acquired photographs of appellant and Korges. Casteel testified he first organized a photographic spread of 20 pictures and displayed them to Mrs. Trammel, and later displayed to her a spread of 29 photographs. Over objection that he was bolstering Mrs. Trammel's unimpeached testimony as to photographic identification, Casteel was permitted to testify that after the last photographic spread display he went to a Justice of the Peace and secured an arrest warrant for the appellant and the co-defendant.

Appellant relies upon *Lyons v. State*, 388 S.W.2d 950 (Tex.Cr.App.1965), and its progeny,[2] which hold that

"While a witness who has identified her assailant at the trial may testify that she also identified him while he was in custody of the police, others may not bolster her unimpeached testimony by corroborating the fact that she did identify him." See also *Davis v. State*, 636 S.W.2d 197 (Tex.Cr.App.1982); *Adams v. State*, 514 S.W.2d 262 (Tex.Cr.App.1974).

In *Pless v. State*, 576 S.W.2d 83 (Tex.Cr. App.1979), this Court stated:

"Bolstering occurs when one item is improperly used by a party to add credence to some *earlier* unimpeached piece of evidence offered by the same party." (Emphasis supplied.)

 The prosecutor appears to have been extremely cautious in his examination of Ranger Casteel. He had Casteel state each step of his investigation and what he did next. Casteel did not testify that Mrs. Trammel had identified appellant or Korges from any photographic display. He testified that he showed two photographic spreads to Mrs. Trammel and next he secured warrants of arrest for appellant and Korges. Further, Casteel's testimony came before that of Mrs. Trammel and would not fit the definition of bolstering in *Pless*. Appellant's ground of error is overruled.

Appellant contends the court erred in denying him the right to confront and cross-examine the witnesses against him by allowing the State to read Jo Ellen Trammel's testimony from the prior trial rather than having her testify in person.

Dr. Garner Klein, cardiologist, testified Mrs. Trammel had been under his care for approximately three years, that she suffered from high blood pressure, heart disease, and had had a stroke on February 8, 1977, some eight months before, that more recently he had determined she had atrial

**2.** See *Wyatt v. State*, 566 S.W.2d 597, 601 (Tex. Cr.App.1978); *Williams v. State*, 531 S.W.2d 606, 611 (Tex.Cr.App.1975); *Hills v. State*, 524 S.W.2d 692, 693 (Tex.Cr.App.1975); *Smith v.*

*State*, 520 S.W.2d 383, 384 (Tex.Cr.App.1975); *Adams v. State*, 514 S.W.2d 262, 264 (Tex.Cr. App.1974); *Jackson v. State*, 507 S.W.2d 231 (Tex.Cr.App.1974).

fibrillation, an irregular heartbeat. Dr. Klein had observed that a discussion of the alleged offense did bring on stress, that she had conveyed that theory to him and he had interpreted that as being manifest by the worsening of her blood pressure and frequency of chest pains. She was taking 16 medical pills or tablets a day. He expressed his best medical opinion that her health was not such that she could come to court and testify. The record then reflects:

"Q Now, then why do you say that, Doctor?

"A Well, it would require some explanation. Number 1, she has a rather precarious situation in regards to her heart, in circulation, because of her high blood pressure and heart disease. I think any form of stress, either physical or emotional, could be disastrous for her.

 * * * * * *

"Q And then could one of the end results of that situation be either death or more serious impairment of her health?

"A Certainly. She could have a heart attack or stroke. Death from either one.

 * * * * * *

"Q If the stress situation that she would be confronted with during the course of the trial were such it could bring about her death?

"A That is right."

Later after explaining her medical condition was not likely to ever improve, the doctor on re-direct examination was again questioned:

"Q And to determine whether or not she will either die or be hospitalized as a result of appearing, is to force her to appear, isn't it?

"A That is right.

"Q But it is your opinion that if that occurs that it will be one or the other? It will be hospitalization or the end result, the worst, could be death?

"A That is right."

On cross-examination Dr. Klein acknowledged Mrs. Trammel had suffered from high blood pressure for a number of years and it now was responding to medication, that she had a remarkable recovery from her strokes, that she was unable to speak at first, but now spoke "although she tends to hesitate some." He did not, however, change his medical opinion. That remained uncontroverted.

The court overruled appellant's objection and permitted the reproduction of the testimony of Jo Ellen Trammel from the prior trial under the authority of Article 39.02, V.A.C.C.P., which provides, inter alia, that such reproduction may be permitted when the witness is unable to attend because of "age or bodily infirmity." The record is adequate to show that the testimony was under oath, was competent, that the witness confronted the appellant who was present and represented by counsel, and was cross-examined by appellant's counsel who also represented him at the instant trial and that the charged offense was the same at both trials.

In *Raley v. State*, 548 S.W.2d 33 (Tex.Cr. App.1977), cited by the appellant, the Court wrote:

"To be admissible it must be shown that the witness's testimony at the former trial or hearing was given under oath, that it was competent, that the accused was present and had adequate opportunity to cross-examine him through counsel, and that the accused was the defendant at the former trial or hearing upon the same charge. See 24 Tex.Jur.2d, Sec. 698, p. 337; *Pointer v. State of Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Forbes v. State*, 513 S.W.2d 72 (Tex.Cr.App.1974); *Carver v. State*, 510 S.W.2d 349 (Tex.Cr. App.1974). Such predicate must be clearly and satisfactorily established before such testimony can be reproduced. 1 Branch's Ann.P.C.2d ed., Sec. 99, p. 112."

We conclude the State sustained its burden of establishing an exception to the constitutional right of confrontation.

*Forbes v. State*, 513 S.W.2d 72 (Tex.Cr. App.1974), *cert. den.* 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975); *Carver v. State*, 510 S.W.2d 349 (Tex.Cr.App.1974), *cert. den.* 419 U.S. 841, 95 S.Ct. 71, 42 L.Ed.2d 68 (1974). See also *Galvan v. State*, 461 S.W.2d 396 (Tex.Cr.App.1970). The ground of error is overruled.

Appellant also urges the trial court erred in failing to allow him to introduce evidence at the guilt stage of the trial that there were two jail escapes from his Cameron County jail cell, after his arrest and incarceration, and that while he had an opportunity to flee he did not do so.

At the penalty stage of the trial the court permitted the evidence of "non-escape" to be introduced under its broad discretionary power to permit all relevant testimony at such hearing. See Article 37.-071, V.A.C.C.P. When offered earlier, however, at the guilt stage the court refused to permit such evidence.

Appellant argues that "flight" is admissible on the issue of guilt, see *Keller v. State*, 606 S.W.2d 931 (Tex.Cr.App.1980), thus evidence of "non-escape" should also be admissible as "a good rule of evidence works both ways." *Robinson v. State*, 548 S.W.2d 63, 68 (Tex.Cr.App.1977).

█ While flight may be admissible, it does not automatically follow that "non-escape" is always admissible on the issue of guilt. "Failure to flee does not necessarily tend to prove innocence." *Millner v. State*, 72 Tex.Cr.R. 45, 162 S.W. 348 (1913).

█ Appellant has failed to demonstrate the relevancy of the evidence offered on the issue of guilt nor has he cited any authority in support thereof. If the exclusion was error, there is no showing of harm. Appellant's ground of error is overruled.

Appellant further complains the trial court erred in failing to grant mistrial when the district attorney offered the jury an opportunity to come to his office for coffee just prior to the recess while the court prepared its charge.

It appears that it was a holiday (Veteran's Day) (Oct. 24, 1977) and most of the courthouse facilities were closed. As the court was excusing the jury the record reflects:

"THE COURT: Mrs. Perez, the coffee stand is closed and that sort of a thing. I will ask you to try to accommodate the jury, if they want a cup of coffee attend to their needs.

"(Whereupon at this point, Mr. Seldon Snedeker, district attorney, made a comment from the audience concerning 'coffee' which was not reported by the court reporter.)

"THE COURT: Well, I think I will decline your offer, Mr. District Attorney. We thank you, sir.

"See if Judge Vela or the Clerk's office or someone has some coffee to accommodate the jury. And if you need anything, any needs you have, you want to make a telephone call or something of that nature. Mrs. Perez will help you."

After the jury retired, the appellant objected to the conduct of the district attorney (who had not actively participated in the trial). Appellant noted the district attorney's name had been frequently mentioned during the voir dire examination of the jury panel and that his volunteering to provide coffee to the jurors was highly prejudicial. He moved for a mistrial. The motion was overruled, but the court agreed to instruct the jury to disregard.

When the jury returned to the courtroom, the trial court instructed them to disregard the district attorney's offer of coffee, and not to let it have any effect upon their deliberations. The court recalled earlier instructions not to mingle or talk with the lawyers, or to accept favors, food or refreshments, etc.

█ We conclude the court's instructions cured any error. Appellant's contention, unsupported by citation of any authority, is overruled.

Next appellant contends the "trial court erred in excluding jurors from service on appellant's jury when they were clearly

qualified to serve under Article 12.31(b) of the Code of Criminal Procedure."

Appellant directs our attention only to prospective juror Fred Ira Lewis. Further it is obvious that appellant has reference to V.T.C.A., Penal Code, § 12.31(b), not the Code of Criminal Procedure.

Appellant notes that prior to trial he filed a motion requesting the court not to excuse prospective jurors who might be disqualified under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), but qualified under § 12.31(b).

This apparently is appellant's position as to prospective juror Lewis. He argues Lewis was qualified by his answers as to § 12.31(b) regardless of whether he was qualified under *Witherspoon*.

Prior to *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), this Court in a number of cases held that a prospective juror in a capital murder case could be disqualified under either § 12.-31(b) or *Witherspoon*. *Adams*, in effect, held that a prospective juror could not be disqualified under § 12.31(b) without meeting the criteria of *Witherspoon*.[3]

*Adams* at 448 U.S. at p. 46, 100 S.Ct. at p. 2527, also said, however:

"If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality."

An examination of the voir dire examination of prospective juror Lewis reflects:

"Q: Could you yourself be a part to inflicting death as a punishment for crime?

"A: No.

"Q: ... if the facts and circumstances warrant it?

"A: No.

"Q: Would you in every case where you were called as a prospective juror and you were asked that same question automatically vote against the infliction of death—

"A: Yes.

"Q: ... as punishment for crime?

"A: Yes, sir."

Later the court intervened.

"THE COURT: ... Now if you came to the point in your deliberations on the answering of those two questions, are you saying, at this time, that you have conscientious scruples or moral consideration which would prevent you from answering these two questions 'yes' and thus prevent by your verdict at least the assessment of the death penalty?

"VENIREMAN LEWIS: I wouldn't vote for it.

"THE COURT: You would not vote?

"VENIREMAN LEWIS: No. Whereby the death penalty would be given.

"THE COURT: And you in no case, regardless of how terrible the case would be, how bad the crime would be, how heinous the crime would be, would answer the two questions 'yes' so that the death penalty would be assessed as punishment in the case?

---

**3.** In *Adams* the question presented was whether Texas contravened the Sixth and Fourteenth Amendments of the United States Constitution as construed and applied in *Witherspoon* when it excluded members of the venire from jury service because they were unable to state under oath as prescribed by V.T.C.A., Penal Code, § 12.31(b), that the mandatory penalty of death or life imprisonment in a capital murder case would not affect their deliberations on any issue of fact.

In *Adams* the United States Supreme Court reversed the conviction and set aside the death

penalty imposed holding that *Witherspoon* and said § 12.31(b) may not co-exist as separate and independent bases for excluding prospective jurors so as to permit exclusion under § 12.31(b) on a ground broader than permitted by *Witherspoon*. The Court noted, however, that the State could, consistent with *Witherspoon*, use § 12.-31(a) to exclude prospective jurors whose views in capital punishment are such as to make them unable to follow the law or obey their oaths. See now *Evans v. State*, 614 S.W.2d 414 (Tex.Cr. App.1980).

"VENIREMAN LEWIS: No, sir, because we still have the life imprisonment.

\* \* \* \* \* \*

"VENIREMAN LEWIS: I would not give the death penalty because I think there is always that human error element involved, even in the jury.

\* \* \* \* \* \*

"THE COURT: Again, we go back to the fact that you are, you say, against the death penalty in any case; that you would automatically vote against it—

"VENIREMAN LEWIS: Yes, sir, I guess so.

"THE COURT: —if taken as a juror in a case? All right.

"MR. HENDRLEY (Prosecutor): Judge, I have challenged the juror for cause."

Thereafter the trial court sustained the challenge for cause over appellant's objection.

It appears Lewis was disqualified under *Witherspoon* and the above quoted portion of *Adams*. See *Smith v. State*, 676 S.W.2d 379 (Tex.Cr.App.1984).

Still further in *Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held in that case that in determining whether a prospective juror could be excluded for cause because of her views on capital punishment, the Court of Appeals, at minimum, erred in focusing unduly on lack of clarity of questioning of prospective jurors, and in focusing on whether her answers indicated that she would "automatically" vote against the death penalty.

There the Court wrote:

"We therefore take this opportunity to clarify our decision in *Witherspoon* and to reaffirm the above-quoted standard from *Adams* [4] as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon's* reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully *infra*, this is why deference must be paid to the trial judge who sees and hears the juror."

■ Giving the proper degree of deference to the trial court's determination, we conclude that prospective juror Lewis was properly excused upon challenge for cause based on the *Adams* standard adopted in *Witt*. The record makes clear Lewis' views were such as would prevent or substantially impair the performance of his duties as a juror in accordance with these instructions

---

4. The standard referred is set out in *Adams:*
"This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance*

*with his instructions and his oath.* The State may insist, however, that jurors will consider and decide the fact impartially and conscientiously apply the law as charged by the court." 448 U.S. at 45, 100 S.Ct. at 2526. (Emphasis supplied.)

and his oath. Appellant's ground of error is overruled.

In three grounds of error the appellant contends the trial court erred in overruling his motion to quash the indictment. These are:

"The trial court erred in failing to quash the indictment which was returned by a grand jury which did not represent a cross-section of the community's ethnic makeup in violation of appellant's right to due process of law and equal protection of the laws.

"The trial court erred in not quashing the indictment which was returned by a grand jury made up of at least seventy-five percent (75%) Anglos, when, in fact, the ethnic composition of the community was at least seventy-nine percent (79%) Spanish surnames.

"The trial court erred in ruling that since appellant was not a Spanish surnamed person, he did not have standing to complain of the makeup of the grand jury which indicted him."

Appellant, who was stipulated to be an "Anglo" or "Gringo," appears to complain principally that there was insufficient representation on the grand jury of Mexican-Americans or Spanish surnamed individuals.

After the reversal of appellant's first conviction, a second indictment was returned on January 13, 1976 charging the same offense. At the time appellant was represented by his trial counsel from his first trial who also represented him at the second trial. Appellant was also in custody.

Under Article 19.27, V.A.C.C.P.:

"Before a grand jury has been impaneled, any person may challenge the array of jurors or any person presented as a grand juror. In no other way shall objections to the qualifications and legality of the grand jury be heard. Any person confined in jail in the county shall, upon his request, be brought into court to make such challenge."

If a defendant has an opportunity to challenge the array when it is impaneled and does not do so, he may not challenge it at a later date. *Armentrout v. State,* 138 Tex. Cr.R. 238, 135 S.W.2d 479 (1939), *reh. den.* (1940). In *Muniz v. State,* 573 S.W.2d 792 (Tex.Cr.App.1978), *cert. den.* 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 291 (1979), the defendant was convicted of capital murder. His motion to quash the indictment because of alleged systematic exclusion from the grand jury of Mexican-Americans was denied by the trial court. *Id.* at 796. On appeal this court wrote:

"Thus, appellant was in custody, represented by counsel, and aware at the time the grand jury was impaneled, that he was to be the object of its scrutiny. He failed to challenge the grand jury at that time but did so several months later in a motion to quash." *Id.*

See also *Rodriguez v. State,* 597 S.W.2d 917 (Tex.Cr.App.1980).

It would appear that under *Muniz* and *Rodriguez* appellant waived his right to object.

On April 25, 1977, the appellant filed a pre-trial motion to quash the indictment alleging the grand jury that returned the indictment did not reflect the ethnic make-up of the community and that he was being denied his constitutional guarantees.

On May 9, 1977, when the motion was presented, no ruling was obtained. The court indicated to counsel the motion could be heard at convenient times during the trial on the merits. Appellant's counsel agreed.

On October 3, 1977, a second motion to quash was filed. It was based upon *Welcome v. State,* 438 S.W.2d 99 (Tex.Cr.App. 1969), and did not relate to the makeup of the grand jury. On the same date "An affidavit in support of the Motion to quash indictment" was also filed. The instrument was signed by counsel, but the "Affidavit" portion was not signed or sworn to. This instrument directed the trial court's attention to the decision in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and requested that if the "mo-

tion" was not timely filed a hearing be had to allow appellant to show good cause for the late filing.

On the same date (October 3, 1977) a hearing on this latter "motion" to quash was conducted. At the hearing it was stipulated by the parties that five (5) of the grand jurors who had returned the second indictment against the appellant had Spanish surnames and that 79% of the population in Cameron County had Spanish surnames. It was also stipulated that the appellant was Anglo-American or a "Gringo" in that part of "the country." Other than the stipulations and a list of the grand jurors, no other evidence was offered. No additional time was requested. The court then overruled what the appellant referred to as his *"Partida"* motion.

After petit jury selection but prior to trial, several months later appellant's counsel mentioned to the court he had "additional things" to present on the *"Partida"* motion, but it was not essential to do it then. The court replied, "All right."

After the return of the verdict at the penalty stage of the trial, the appellant offered, over objection,[5] a "bill of exception" on the *"Partida"* motion. For the first time appellant called a deputy district clerk who identified parts of Defense Exhibit 10 as records of the District Clerk of Cameron County. These included orders to the Sheriff to summon certain named grand jurors for the reconvening of a grand jury previously adjourned. Other pages of the exhibit the witnesses acknowledged were prepared by an attorney and brought to the District Clerk's office for checking and identification of Spanish surnames and for certification. These included lists of grand jury commissioners from 1964 to 1977 and the grand jury panels from 1974 through January 1976. None of the pages of said Exhibit No. 11 were shown to be certified by the District Clerk or her deputies. The records, identified by the deputy district clerk as being records of

her office, reflect composition of the same grand juries from July 1971 until August 1976. On the July 1971 grand jury 33% of the jurors had Spanish surnames. In 1972 the percentage of Spanish surnamed jurors in the two grand juries were 50% and 42% respectively. In 1973 those percentages were 58% and 33%. The only grand jury for 1974 shown had 25% of the jurors with Spanish surnames. Of the two grand juries in 1975, one had 75% of the jurors with Spanish surnames and another contained 50%. In 1976 the percentage on both grand juries was 42%.

It appears from what has been said that by failing to timely challenge the array of the grand jury as required by Article 19.27, V.A.C.C.P., the appellant waived his right to later object to the makeup of the grand jury on the grounds now urged. *Muniz v. State,* supra. Appellant never offered any proof that he did not have an opportunity to challenge the array when it was impaneled. He thus bypassed orderly state procedure.

If it can be argued he is not precluded from challenging the grand jury by subsequent motions to quash the indictment, several matters are observed.

 It is well recognized that it is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury from which all persons of his race or color have solely, because of that race or color, been excluded by the State. *Hernandez v. Texas,* 347 U.S. 475, 477, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954). More recent authority emphasizes that substantial underrepresentation of a distinctive group constitutes a constitutional violation. *Castaneda v. Partida,* supra.

In *Partida,* dealing with a denial of equal protection of the laws, the United States Supreme Court wrote:

> "Thus, *in order to show that an equal protection violation* has occurred in the

---

5. The State objected that the *"Partida"* motion had been presented and ruled on before trial, and that after verdict it was too late to offer additional evidence in the guise of a "bill of exception." The court permitted appellant to proceed.

context of grand jury selection, the *defendant must show* that the procedure employed resulted in *substantial underrepresentation of his race or of the identifiable group to which he belongs ...."* (Emphasis supplied.)

In *Espinoza v. State,* 604 S.W.2d 908 (Tex.Cr.App.1980), this Court wrote:

"If the class to which a defendant belongs is fully represented on the indicting grand jury the defendant suffers no injury and exclusion of members of the class from earlier grand juries is irrelevant to his case. Only if the defendant's class is substantially underrepresented on the indicting grand jury does the makeup of prior grand juries become relevant to explain whether this underrepresentation on the indicting grand jury is a statistical accident or the result of purposeful discrimination."

█ It is clear from the stipulation that appellant is an Anglo-American and has not shown that the procedure employed resulted in an underrepresentation of his race or the identifiable group to which he belongs. In fact the contrary is true. Appellant does not claim an underrepresentation of his race, but that of Spanish surnamed individuals in Cameron County of which he is not a member. Appellant has not shown a violation of the equal protection of the laws.

Further, appellant's complaints about the trial court's remarks that appellant was not a Spanish surnamed person and had no standing to complain of the makeup of the grand jury which indicted him are without merit. It appears the trial court was merely stating its interpretation of *Castaneda v. Partida,* supra, which was correct under the circumstances.

Appellant also appears to urge on appeal a violation of due process in the grand jury selection. He did not expressly urge this contention in the trial court. He now cites *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972).

In *Peters* the United States Supreme Court, in a plurality opinion, declared that, whatever his race, a state criminal defendant has standing to challenge the system used to select his grand or petit jury on the ground that it arbitrarily excludes from service the members of any race and therefore denies him due process of law, it not being necessary that the defendant show actual harm or bias.

█ The record does not show an arbitrary or systematic exclusion of Spanish surnamed individuals or Mexican-American from grand jury service in Cameron County as contended by appellant. Quite the contrary is shown. Nothing shows that the tribunal that indicted appellant was selected on an impermissible basis, or was constituted in a manner prohibited by the constitution or by statute. The grand jury was not plainly illegal in its composition. *Peters* is not here controlling.

We have examined the entire record and cannot conclude that a violation of due process is shown. Absent an infringement of the fundamental right to fairness as guaranteed by the due process of law, no basis exists for this Court to reverse appellant's conviction or set aside the indictment against him. Cf. *Hobby v. United States,* — U.S. ——, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984).

Appellant's three grounds of error concerning grand jury selection are overruled.

The judgment is affirmed.