

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00050-CR

_____

PATRICK LEE SMITH, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1512010R

---

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

## I.  Introduction

A jury found that on December 20, 2014, Appellant Patrick Lee Smith, a felon unlawfully possessing a firearm, shot twice—murdering John Williams Jr. and injuring Alvin Wallace—before he fled a strip club's parking lot.  The jury assessed Smith's punishment at confinement for life for Williams's murder, 99 years' confinement for the aggravated assault with a deadly weapon against Wallace, and 18 years' confinement for the felon-in-possession-of-a-firearm offense.  The trial court entered judgments of conviction on the jury's verdict.  In six points, Smith appeals, complaining that the evidence is insufficient to support his aggravated assault conviction and that the trial court abused its discretion during the guilt/innocence phase of trial by admitting evidence of another fight at another bar later that evening and during the punishment phase by overruling his rule 403 objections to bullet casings found after the subsequent fight.  We affirm.

## II.  Sufficiency of the Evidence

In his first point, Smith argues there was no evidence that he shot Wallace.

**A. Standard of Review**

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged.  *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV.  In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict

to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49. "[T]he jury is free to accept or reject any or all of the evidence of either party, and any or all of the testimony of any witness." *Franklin v. State*, 193 S.W.3d 616, 620 (Tex. App.—Fort Worth 2006, no pet.).

## B. Evidence

Some of the evidence presented at trial was inconsistent and, at times, contradictory. It was undisputed that Wallace, Marcus McNeil, Keith Cunningham, and Daron Rutherford were part of a large group—up to thirty people—whom Williams had assembled to surprise his wife Patricia for her birthday. The group left on a party bus from Williams's tattoo parlor at around 11:00 that night. Everyone on the bus—except Wallace and Cunningham—had been drinking. Wallace had smoked marijuana before getting on the bus. According to Patricia, that evening her vision was impaired—she could see only "[f]igures [and] colors"—because her youngest child had broken her glasses earlier that evening.

Wallace suggested taking the bus to a strip club where his "lady friend" worked. When the bus pulled into the strip club's parking lot and parked in the back by the dumpster, a few of the passengers—including Rutherford—stayed on the bus because they were either asleep or passed out. The remaining passengers entered the club. Smith, who was not part of the group, was already inside the club, along with his younger brother Karri Viswanath.

At the bouncers' insistence, the party bus group began to leave at approximately 2:00 a.m. Smith had left the club just moments before Williams's group did.

4

McNeil testified that once the group started walking toward the bus, Williams went to look for Patricia and to get a cigarette,[1] while McNeil walked into the bushes near the bus to urinate. He was urinating when he heard the first shot. Alarmed, he zipped his pants and ran toward the bus. According to McNeil, Wallace, who had been shot in the arm, stumbled toward him,[2] and while McNeil was trying to figure out what was happening, another shot rang out.

Wallace testified that he had been the last in the group to leave the club and that as he was walking back to the bus, a gray Impala pulled up and the driver got out. Observing that Wallace had his right hand in his pocket, the driver, who had dreadlocks, walked up to him and said, "Hey, I already know you ain't got nothing in your pocket." Then the driver shot him. And, according to Wallace, after he was shot, he stumbled toward the bus, looked over his shoulder, and saw the driver shoot Williams in the back. The next thing Wallace recalled, after he had regained consciousness on an ambulance gurney, was seeing Williams's body lying on the ground and the police putting up the yellow crime-scene tape. Wallace identified Smith's younger brother Karri Viswanath as the shooter. Viswanath's cell phone, wallet, and ID were found near Williams's body at the scene.

---

[1]Crime scene investigators found a partially burned cigarette and a lighter by Williams's arm after the shooting.

[2]Crime scene investigators found a series of blood drops in the parking lot leading away from the building and toward the dumpster to a pool of blood near where the bus was parked.

Cunningham testified that upon leaving the club, he had been walking with Williams, Patricia, and Wallace when two cars pulled up—one was a red Impala and the other was an older model SUV—and four men hopped out. One of the four men—the red Impala's driver—had dreadlocks and was holding a silver handgun. Cunningham said that at that point, Wallace was walking in the armed man's direction and talking on his cell phone with his hands in his pockets. Cunningham said that he heard the man say, "Oh, I know you ain't got nothing," just before he saw him shoot Wallace in the arm.

When the first shot was fired, people scattered, leaving Cunningham, Williams, and Patricia standing there. Williams looked at Cunningham and said, "Man, we got to get to the bus," and they started walking toward the bus when another man came up behind them—a tall, slender guy—and asked, "Where are you going?" Williams turned and swung his fist at the slender man, who dodged the punch. Cunningham said that when the slender man dodged the punch, the other man ran up behind Williams and shot him in the back. Cunningham testified that the shooter was the same man who had shot Wallace.

Cunningham testified that once Williams was shot and fell to the ground, the slender man kicked Williams in the face. At that point, Patricia punched the slender man in the face and knocked him to the ground. The shooter then pointed his gun at Patricia's head and said, "Bitch, you better get back." Cunningham then stepped in front of Patricia and told the man, "Let us get our brother. You shot my brother."

6

And, according to Cunningham, the shooter looked at him for a minute, and then he got in a car and sped off.

The shootings woke Rutherford, who had been asleep on the bus. After lending his cell phone to someone else to call the police, he looked around and found Viswanath's wallet on the ground about two feet from Williams's body. Rutherford picked it up, initially thinking that it belonged to one of Williams's group, but after he asked around, no one claimed it. One of the members of his group identified it as belonging to the man "who shot [Williams] in the back[] and . . . drove off." An officer eventually retrieved the wallet from Rutherford, but in the meantime, some of the members of the group took note of Viswanath's name and tried to find information about him on Facebook.

Fort Worth Police Department crime scene investigators found two spent .45 caliber shell casings[3] at the scene. One was found near the beginning of the blood trail left by Wallace. They also found two 9-millimeter live (unfired) rounds and a 9-millimeter casing, but Officer Bain testified that it would not surprise him to find shell casings unrelated to this incident in the strip club's parking lot because he had previously worked crime scenes at that location. Photos of Wallace's arm, showing

---

[3]Fort Worth Police Officer Christopher Bain of the crime scene search unit testified that a shell casing is the part of a bullet that encompasses the gunpowder and the tip of the bullet. When someone pulls a semiautomatic gun's trigger, it releases the firing pin and hits the backside of the casing and ignites the gunpowder, which causes the explosion that propels the projectile that is partially inside the casing. The bullet piece goes out through the gun's barrel while the casing itself is ejected.

the entry and exit wounds, were admitted into evidence. The medical examiner testified that she found the .45 caliber bullet that killed Williams in his body bag.[4] Fort Worth Police Department forensic scientist Lorelei Peterson compared the two spent .45 caliber shell casings and testified that they were fired from the same firearm but on cross-examination, she agreed that she could not testify whether the bullet that killed Williams was fired from either of the spent .45 caliber cartridges.

Police interviewed Viswanath (whose hair was in braids in his ID photo) twice. They also pulled DVR footage from the internal surveillance cameras at the strip club, which showed when Viswanath (who had short hair at the time) and Smith (who had dreadlocks at the time) had entered and exited the club that night. After Smith was developed as a suspect, the police also interviewed him twice. Smith admitted that he had fired a weapon but claimed that he had fired only one shot, and he told the police that he fired the shot toward the crowd to get them off of his brother. In both interviews, Smith denied firing the gun more than once. In the first interview, Smith revealed that he had left the scene of the shooting in a silver Impala and said that his brother Viswanath had been driving a burgundy Impala that evening.

Viswanath testified during Smith's defense and said that he had lost his wallet, his cell phone, and his ID during a scuffle in the parking lot. He identified the wallet

---

[4]The medical examiner explained that because Williams weighed over 300 pounds, the bullet lost a lot of energy as it passed through his body and into part of his spinal cord, aorta, and liver—as indicated by the shape of its exit wound—preventing it from getting past Williams's clothing.

and ID entered in evidence as his and claimed that if Smith had not come to his aid, he would have died in the parking lot during the incident, which lasted less than three minutes. Viswanath described a confrontation with Williams in the parking lot over some women in the group that Viswanath had been trying to chat up. He said that he could tell that Williams was agitated that Viswanath was "talking to his women." Viswanath said that during the confrontation he told Williams, "Well, if she with you, she talking to me like she giving me some play."

Williams responded that he had "heat" for people like him, which Viswanath interpreted to mean that Williams had a gun. Viswanath replied, "I ain't got nothing but hands for" someone like Williams, by which he meant that he did not have a gun but was ready to fight. After Viswanath's remark, Williams swung at him, and Viswanath ducked. Viswanath said that everyone in the group started fighting, that there were probably five men around him,[5] and that he ended up on the ground being kicked, stomped, and punched. The altercation put Viswanath in fear for his life because—due to a shooting the previous year—he already had a bullet in his chest near his heart. Viswanath testified that a doctor had told him that if the bullet near his heart moved, it would most likely cause his heart to explode. Both Viswanath and Smith stated that Smith was aware of his younger brother's medical condition.

---

[5]Viswanath said that Williams and his friends were "20 deep on a party bus," making it a big confrontation when there were only three others in Viswanath's group, and he estimated that four or five people put their hands on him that night.

Viswanath heard the gunshot that killed Williams and said that afterward Smith pulled him to his car and told him to get in and "let's just go."

**C. Analysis**

Smith's indictment alleged that he had intentionally or knowingly caused bodily injury to Wallace by shooting him with a firearm, a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a). Smith contends that Wallace never testified that Smith had shot him and that no one saw who had shot Wallace.

Although Wallace identified Viswanath, who did not have dreadlocks that night, as the shooter and said that the shooter had driven a gray Impala, Wallace also testified that the same man—a man with dreadlocks—had shot him and had shot Williams. Likewise, Cunningham testified that the same man—a man with dreadlocks—had shot Wallace and Williams, although he said that the shooter had driven a red, rather than a gray, Impala.

Notwithstanding minor inconsistencies and the fact that several of the witnesses' senses had been dulled by drugs, alcohol, or the lateness of the hour, the jury was entitled to gauge the witnesses' credibility and to determine that Smith, a man with dreadlocks and Viswanath's brother, had shot Wallace in the arm before he shot Williams in the back. Given the additional evidence developed at the crime scene and during forensic analysis—including the strip club video showing Viswanath with short hair and Smith with dreadlocks, the blood trail in the parking lot, the timing of the shots, the spent .45 caliber cartridges that were fired from the same gun and that were

10

found near the site of Wallace's shooting and the site of Williams's shooting, the .45 caliber bullet recovered from Williams's body bag, and Smith's admission that he had fired the gun (albeit only once, according to Smith)—a rational jury could have found beyond a reasonable doubt that Smith had committed both crimes. And in its consideration of the evidence, the jury was entitled to disbelieve Smith's statement to the police that he had fired only one shot and Viswanath's testimony that he had heard only the gunshot that killed Williams. Accordingly, we hold that the evidence is sufficient to support Smith's conviction for the aggravated assault of Wallace, and we overrule Smith's first point.

## III. Evidentiary Objections

In his final five points, Smith complains that the trial court abused its discretion by allowing the State to introduce inadmissible evidence during the guilt/innocence phase of trial and by allowing the State to introduce over his rule 403 objections four exhibits into evidence during the punishment phase of trial.

### A. Standard of Review

The admissibility of evidence is within the trial court's discretion and will not be overturned absent an abuse of discretion. *Moses v. State,* 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Smith v. State*, 316 S.W.3d 688, 698 (Tex. App.—Fort Worth 2010, pet. ref'd). So long as the trial court's ruling lies within the zone of reasonable disagreement, the appellate court should affirm. *Moses*, 105 S.W.3d at 627; *Smith*, 316 S.W.3d at 698.

## B. Extraneous Offense Evidence

In his second point, Smith argues that the trial court abused its discretion during the guilt/innocence phase by allowing the State to introduce evidence of an alleged fight between Smith and a group of men at Blaqberry's, an after-hours club, on the same day as the shooting. Smith argued that the second fight was not relevant or admissible as same-transaction contextual evidence and that its admission violated his substantial rights under rule of appellate procedure 44.2(b).

The State responds that Smith failed to preserve his second point because he received all relief that he requested when the trial court sustained his objection to the testimony about a second shooting that night. The State further points out that no extraneous offense evidence was admitted because Viswanath did not mention Smith's participation in the fight at Blaqberry's and in no way implicated him in an extraneous offense or bad act.

During the State's cross-examination of Viswanath, the prosecutor requested a hearing outside the jury's presence. The prosecutor sought permission to question Viswanath about an extraneous offense that occurred later on the same night of the strip club shooting at a different bar, Blaqberry's where Viswanath again got into a fight and Smith pulled out a gun and shot someone. On voir dire, Viswanath agreed that he was at Blaqberry's sometime after 2 a.m., that Smith was there too, and that he—once more—had gotten into a fight. But Viswanath said that he was unaware of any gunshots because he was knocked out during the fight. Smith argued that the

12

evidence was not relevant because Viswanath said that he had passed out and thus could not testify as to what had occurred after that.

After a brief recess, the trial court ruled that because Viswanath said that he did not know about any shots at Blaqberry's because he got knocked out, the prosecutor could not inquire of Viswanath about the shooting at Blaqberry's. But the trial court did permit the State to ask Viswanath where he and Smith went after the shooting at the strip club, what time they got there, where the bar was located, and what Viswanath's role was in the fight in that bar's parking lot.[6] Smith raised a relevance objection and a rule 403 objection, complaining that Viswanath never said anything inconsistent about Blaqberry's except in his statement to the police. The following colloquy then occurred:

> THE COURT: Well, they haven't gone into an extraneous with your -- with your defendant yet.
>
> [Defense counsel]: That's their intent.
>
> THE COURT: Well --
>
> [Defense counsel]: That's the whole scheme of their plan.
>
> THE COURT: Well, I understand that, but they haven't asked the question yet. So I'm specifically ruling that they are not going to -- so okay.

---

[6]The trial court mused that with regard to the shooting at Blaqberry's, the temporal proximity of the two incidents would favor admissibility, as well as "the fact that it occurred in a bar, in a parking lot on the same night and outside the bar and it was a fight would tend to favor admissibility from a relevant standpoint," but "the crux of this issue is whether or not it tends to rebut a defensive theory."

13

[Defense counsel]: Okay.

THE COURT: As to any shooting that the defendant may have committed at Blaqberry's in Arlington, I will sustain that objection at this time.

[Defense counsel]: I understand. Thank you, Your Honor.

THE COURT: Okay?

[Defense counsel]: *That's all I'm asking.*

THE COURT: *But everything else, they can go into.* Are we clear on that, on that Rule of Evidence?

[Defense counsel]: *I'm not disputing that issue.*

THE COURT: Okay.

[Defense counsel]: *I'm talking about the other issue.* Thank you. [Emphasis added.]

When the testimony before the jury resumed, Viswanath testified that after he and Smith had left the strip club with their two friends Ben and Wayne, who had been at the strip club with them, the four went to Blaqberry's, an after-hours club in Arlington. According to Viswanath, they arrived sometime after 2:00 a.m. He acknowledged that while at Blaqberry's, he got into another fight. Viswanath said that when he walked out of the bar, he was hit and knocked unconscious and did not know what happened after that. But he did confirm that he had been in two separate fights at two separate clubs on December 20, 2014. Smith's counsel's only objections during Viswanath's testimony were to a sidebar comment by the prosecutor and to

14

her leading questions. On redirect, Smith's counsel asked Viswanath about the fight at the strip club but did not inquire about the fight at Blaqberry's.

The defense rested at the conclusion of Viswanath's testimony, and the trial court dismissed the jury for the day. Then the prosecutor once more urged the trial court to allow the State to go into the shooting at Blaqberry's in rebuttal. The trial court ordered a hearing outside the jury's presence the following day. However, when the parties went on the record the following day, the State opted for no rebuttal.

Smith now argues that the evidence of the second fight had no tendency to make more probable the existence of any fact of consequence to the case, and even if it was relevant, it was not admissible as same-transaction contextual evidence.

Preservation does not require "magic language"; instead, it turns only on whether the trial court understood the basis of the objection. *State v. Rosseau*, 396 S.W.3d 550, 555 (Tex. Crim. App. 2013). Although no "hyper-technical or formalistic use of words or phrases" is required in order for an objection to preserve an error, the objecting party must still "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (quoting *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009)).

We agree with the State that the record does not reflect that Smith clearly preserved this complaint for our review. *See* Tex. R. App. P. 33.1. We also agree with

15

the State that the complained-of testimony does not show an extraneous offense connected to Smith. *See* Tex. R. Evid. 404(b) (defining extraneous-offense evidence); *Johnson v. State*, 190 S.W.3d 838, 840 (Tex. App.—Fort Worth 2006, no pet.) ("To constitute an extraneous offense, the evidence must show a crime or bad act, and that the defendant was connected to it."). Viswanath's testimony showed only that Smith went to another bar after the incident at the strip club and that *Viswanath* walked out of the second bar, was hit, and was knocked unconscious. Viswanath said, "*We* didn't get into it with these guys or nothing. It was just all of a sudden, we walked out the club, and now here it is," and, "It was just *I* walked outside the club[,] and now *I'm* getting hit." [Emphases added.]

Because Smith failed to adequately apprise the trial court of the basis of his objection, we overrule Smith's second point.

## C. Rule 403 Objections

In his final four points, Smith argues that the trial court abused its discretion during the punishment phase of trial by allowing the State to introduce into evidence State's Exhibits 106, 108, 110, and 112—four .45 caliber shell casings found at Blaqberry's that Peterson subsequently testified were fired from the same firearm as the weapon that fired the spent .45 caliber casings found in the strip club parking lot. Specifically, Smith complains that the trial court overruled his rule 403 objections, that the State did not lay the proper predicate, that the trial court did not conduct the

16

required rule 403 balancing test, and that the trial court abused its discretion by "allowing the introduction of the testimony into evidence."

The State responds that Smith forfeited his improper-predicate complaints because he did not raise them in the trial court or inform the trial court of how the predicates for the exhibits were deficient. The State refers us to *Bird v. State*, 692 S.W.2d 65, 70 (Tex. Crim. App. 1985), wherein the court of criminal appeals held that when the only objection is that "proper predicate ha[s] not been laid," the objection is "too general to preserve error." In *Bird*, the court held that to preserve error, counsel must "inform the court just how the predicate is deficient." *Id.*

During the punishment phase, when the State offered into evidence the .45 caliber shell casings that the Arlington Police Department crime scene investigators located at Blaqberry's on December 20, 2014, Smith raised his rule 403 objections. Counsel stated, "I have a 403 objection to -- I am going to be specific to 105 and 106; a 403 objection to 107 and 108; a 403 objection to 109 and 110; and a 403 objection to 111 and 112."[7] The trial court stated, "I'll consider your 403 objections to 106, 108, 110, 112. I conducted a balancing test upon the -- probative value is not substantially outweighed by the prejudicial effect. Therefore, 106, 108, State's 110, and State's 112 are all admitted for all purposes."

---

[7]State's Exhibits 105, 107, 109, and 111 were the envelopes containing the casings. When the prosecutor said that those exhibits could be put in for record purposes only, Smith stated, "I have no objection for the record," and the trial court admitted those exhibits for record purposes only.

We agree with the State that Smith failed to preserve his "improper predicate" complaints because he did not sufficiently raise them in the trial court, *see* Tex. R. App. P. 33.1, and we overrule this portion of his final four points. *See Mallory v. State*, No. 02-17-00279-CR, 2019 WL 618893, at *12 n.15 (Tex. App.—Fort Worth Feb. 14, 2019, pet. ref'd) (mem. op., not designated for publication) (citing cases addressing failure to preserve "proper predicate" objection).

When a rule 403 objection is made, the trial court has no discretion as to whether or not to engage in the balancing process. *Santellan v. State*, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997). But the trial court is not required to conduct the balancing test on the record. *See id.* (holding, when the trial court did not explicitly refuse to do the test and simply overruled the appellant's rule 403 objections, that there was nothing in the record to indicate that the trial court did not perform a balancing test). Here, the record affirmatively reflects that the trial court considered whether the exhibits' probative value was substantially outweighed by their prejudicial effect, and concluded that it was not. *See* Tex. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed *by a danger of one or more of the following: unfair prejudice*, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence" (emphasis added)); *see also* Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1) (explaining that during the punishment phase, evidence may be offered by the State and the defendant as to any matter the court deems relevant to sentencing, "including but not limited to . . . notwithstanding

18

Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible"). We overrule this portion of Smith's final four points.

Finally, Smith argues that the trial court abused its discretion by admitting the testimony about the exhibits. But he did not object to the testimony describing the exhibits during trial and thus forfeited any error with regard to this complaint. *See, e.g., Mallory*, 2019 WL 618893, at *12 n.15. We overrule the remainder of Smith's final four points.

## IV. Conclusion

Having overruled all of Smith's points, we affirm the trial court's judgments.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 22, 2019

19