**Affirmed and Memorandum Opinion filed October 11, 2012.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00958-CR

---

### WILLIAM JOHN BEICHNER, Appellant,

### V.

### THE STATE OF TEXAS, Appellee.

---

**On Appeal from the 338th District Court**
**Harris County**
**Trial Court Cause No. 1280606**

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant William John Beichner guilty of murder and assessed his punishment at 35 years' imprisonment in the Texas Department of Criminal Justice, Institutional Division. In a single issue, he contends the evidence is legally insufficient to support his conviction. We affirm.

# I

In October 2010, Beichner and Wanda Kilgore, the complainant, were living together at the Balboa Apartments in Nassau Bay, Texas. They had been living together for about two years. During that time, Nassau Bay police had been dispatched to their residence for domestic violence calls several times.

Jason and Jessica Rockwell also lived at the Balboa Apartments around the corner from Beichner and Kilgore. The first time they saw Beichner was the day before Kilgore was murdered. On that day, Jason and Jessica saw Beichner at a pier behind the apartment complex. Beichner was staggering as if he was intoxicated and was bleeding from his arm.

On the day of the murder, October 6, 2010, the Rockwells arrived home with their daughter around midnight after spending the evening watching television with friends at another apartment. As they approached their apartment door, they saw Beichner standing nearby. He was naked, covered in blood, and holding a butcher knife. According to Jason, Beichner appeared to be intoxicated, but the officers who later arrived at the scene of the crime did not note that he was intoxicated.

Jason made sure Jessica and their daughter were safely inside their apartment before he went to speak to Beichner to find out what was happening. Beichner said to Jason, "I need help. Can someone help me?" Beichner also stated that his wife might be dead. Beichner repeatedly asked Jason to kick down his apartment door. Jason refused, but he asked his wife to call the apartment maintenance man to assist Beichner. Jessica called the maintenance man and the police. While waiting for the police to arrive, Jason explained to Beichner that he did not feel comfortable with him holding a knife, so Beichner dropped the knife, and Jason kicked it down the hallway.

To avoid agitating Beichner as they waited, Jason brought two chairs outside from his apartment as well as a towel for Beichner to use to cover himself. Jason sat with Beichner and engaged him in small talk in an effort to keep Beichner calm until the

2

police arrived. At one point, Beichner told Jason that "the crazy bitch cut me." During the conversation, Jason asked Beichner if he thought he was going to get in trouble for "this," and Beichner stated that "this time" he thought he would.

As the conversation continued, Jason explained to Beichner that the police would be arriving soon. Beichner then asked Jason several times to get rid of the knife. When Jason refused, Beichner picked up the knife and walked around the corner toward his apartment. When Beichner returned, he no longer had the knife.

Shortly after that, three Nassau Bay police officers arrived after being dispatched to a possible stabbing. Because of the nature of the call, all three deployed their assault rifles and went to the second floor of the apartment complex where Beichner and Jason were sitting. Jason and Beichner were both detained until the officers could determine what happened. The officers eventually released Jason, who had no further interaction with Beichner.

The officers saw that Beichner had blood on his arms, face, and upper torso, and so they assumed someone had been injured. Beichner could not get on the ground because of a bad hip, so the officers sat him in a chair to handcuff him. One officer asked Beichner where his wife was, and Beichner told him she was in the apartment. As a result, officers proceeded to Beichner's apartment where they saw a blood smear on the outside of the door. They also saw a butcher knife placed against the door frame with the tip pointing down.

Officers attempted to open the door, but it was locked from the inside by a deadbolt lock and C-clamp, both of which could only be engaged by someone inside the apartment. Officers forcibly entered the apartment, and once inside, they saw a blood transfer on the door's strike plate, the inside door knob, and the lock, consistent with someone touching those areas with bloodied hands. There was also a puddle of blood in the entryway just inside the door. As officers began their sweep of the apartment, they immediately saw Kilgore lying on a bed in her nightgown and bleeding heavily from her abdomen. One of the officers checked Kilgore for a pulse, and she was cold to the touch.

3

A cell phone was within her reach.

A detective from the Nassau Bay Police Department was dispatched to the scene to collect evidence. The detective observed the apartment to be dirty and in disarray with mail, liquor bottles, trash, and spent cigarettes on the floor. The detective looked at the cell phone near Kilgore's hand and determined that a call was made to "David cell" at 11:41 p.m. lasting fourteen seconds and another made to "711" at 12:02 a.m., twenty-one minutes later. Through investigation, the detective learned that the first call made was to Kilgore's son, John David Green, and Kilgore left a voicemail saying, "David, I need help." Green did not get the message until the next day around 9:30 a.m., shortly before he was notified that his mother had died. The second call, made to "711," lasted for eight minutes and fifty-seven seconds.

The detective also saw a paring knife under the bed where Kilgore was lying. Only a portion of the handle was visible. Based on the position of the knife and Kilgore's body on the bed, the detective did not believe it was plausible that Kilgore had possession of the knife and then dropped it shortly before she died. Nevertheless, the detective admitted on cross-examination that this was possible. No blood was found on the blade of the knife.

The medical examiner who conducted Kilgore's autopsy determined that Kilgore died from a stab wound to her upper-mid abdomen that punctured her liver and caused a large amount of blood loss. He concluded that the knife Beichner was holding at the scene could have cause the injury. Based on Kilgore's injury, he stated that it could have taken some time before she died, giving her time to make two phone calls within a twenty-minute time period before losing consciousness. The medical examiner also noted Kilgore had multiple contusions and abrasions to her hands, arms, and face. Though he determined the contusions were fairly fresh and could have been caused at or near the time of her death, he acknowledged they could have occurred several hours prior to her dying. He also testified that Kilgore had a superficial wound with some bleeding around it on her scalp.

4

After finding Kilgore dead in the apartment and speaking to Jason, officers arrested Beichner and took him to jail. Beichner appeared to have old scabs on his body that had opened up and caused bleeding, but he did not have any gunshot or stab wounds. While in jail, Beichner asked to call his wife and said she had slammed the door on his finger. When an officer attempted to ask Beichner what happened, he invoked his right to counsel.

II

A

When reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Because the fact finder is the sole judge of the credibility of witnesses and of the weight given to their testimony, any conflicts or inconsistencies in the evidence are resolved in favor of the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Our review considers both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, a reviewing court must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that determination. *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 326).

A person commits murder if he intentionally or knowingly causes the death of an individual, or intends to cause serious bodily injury and commits an act clearly dangerous

to human life that causes the death of an individual. *See* Tex. Penal Code §§ 19.02(b)(1), 19.02(b)(2).

B

On appeal, Beichner contends that the evidence was legally insufficient to prove that he committed murder. In the alternative, he argues that if he had stabbed Kilgore, the evidence did not support the jury's rejection of his self-defense claim.

First, Beichner argues that the evidence was insufficient to support the jury's finding because "[a]t most, the evidence showed that [Kilgore] died of a stab wound to the stomach and that [Beichner] was found outside walking around naked with blood on him and holding a knife." Beichner claims that there was no evidence that the knife he was holding was actually the knife used to kill Kilgore, and no evidence that Kilgore's blood was on the knife. Further, he maintains that his actions were not consistent with a person trying to cover up or escape from a crime, because he sat in a hallway talking to a neighbor before the police arrived.

Viewing the evidence in the light most favorable to the verdict, however, a rational jury could have found that Beichner murdered Kilgore. Testimony showed that Beichner and Kilgore had a rocky relationship.[1] Officers had been dispatched to the apartment they shared on at least two occasions for domestic problems. Beichner's next-door neighbor testified that on several occasions she or her husband heard arguing and had to ask Beichner and Kilgore to please be quiet. On the night Kilgore was stabbed, the same neighbor heard loud arguing coming from Beichner's apartment but ignored it and went to bed. When the Rockwells returned home that night, they saw Beichner naked, covered with blood, and holding a butcher knife outside the apartment he shared with

---

[1] There was also testimony that Beichner was often intoxicated, which could have contributed to the murder. Just one day earlier, the Rockwells both testified that they saw Beichner intoxicated by the pier near the apartments. Additionally, the next-door neighbor stated that she had never seen Beichner sober, and two officers testified that they had seen Beichner intoxicated on several previous occasions. When Jason spoke to Beichner after arriving home on the night of the incident, he believed Beichner was again intoxicated. The jury could have reasonably concluded that Beichner was intoxicated, and his intoxication affected his thinking and actions.

Kilgore. The medical examiner confirmed that the butcher knife could have made Kilgore's stab wound. In a conversation with Jason while waiting for police, Beichner told Jason he thought his wife might be dead inside the apartment and he thought he was going to get into trouble for "this." Further, Beichner's apartment was locked from the inside, and the only person inside was Kilgore. The jury heard evidence that just inside the door officers found a puddle of blood and saw that the inside doorknob and lock had blood on them. The jury could have reasonably concluded that Kilgore, fearing for her safety after Beichner stabbed her, managed to lock him out of the apartment without his clothes.

The fact that Beichner did not attempt to run from the police does not necessarily indicate he did not commit murder. *See Bird v. State*, 692 S.W.2d 65, 73 (Tex. Crim. App. 1985) (stating that failure to flee does not necessarily tend to prove innocence). The jury heard evidence that Beichner's physical condition may have kept him from escaping, even if he had wanted to do so. Beichner was unable to get on the ground when police arrived because of a bad hip. According to officers, they had to sit him in a chair to arrest him. Kilgore's son also testified that Beichner had difficulty walking, stating that he "was in bad shape" and "couldn't get around hardly at all." And, even though Beichner never attempted to run from police, Jason testified that, when it was apparent the police were about to arrive, Beichner repeatedly asked him to get rid of the knife. When Jason refused, Beichner walked around the corner and placed the knife at his front door. A jury could reasonably infer that Beichner put the knife around the corner in the hope police would not find it. Thus, viewing the evidence in the light most favorable to the prosecution, a rational jury could have found beyond a reasonable doubt that the evidence was sufficient to prove that Beichner murdered Kilgore.

In the alternative, Beichner argues that even if he did murder Kilgore, a rational jury would not have concluded beyond a reasonable doubt that he was not acting in self-defense. When asserting self-defense, the defendant has the burden of production and must bring forth some evidence to support the particular defense. *Zuliani v. State*, 97

7

S.W.3d 589, 594 (Tex. Crim. App. 2003). But, once the defense is raised, the State bears the burden of persuasion to disprove the defense. *Id.* The burden of persuasion is not one that requires the production of evidence; rather, it requires only that the State prove its case beyond a reasonable doubt. *Id.* The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject any defensive evidence on the issue. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). When a jury finds the defendant guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594.

Beichner points to evidence that he pleaded with his neighbor, "I need help. Can someone help me?" and later stated, "The crazy bitch cut me." Beichner also points out that the medical examiner found that Kilgore had a blood-alcohol level "somewhere in the range of .24 to .27" and "a knife was found on the floor just under where the complainant's hand was hanging off the bed." Consequently, Beichner argues, the State failed to disprove self-defense beyond a reasonable doubt.

Although Beichner stated that Kilgore "cut" him and he needed help, there was no testimony that he had a stab wound or other serious injury indicating Kilgore attacked him. Further, the evidence that Kilgore locked Beichner out of their apartment is some evidence that she was attempting to protect herself from an attack. The jury also could have found that Kilgore did not drop the paring knife found on the floor under her bed. A detective testified that the apartment was very messy so the knife could have been under the bed before the attack began. And there was no blood on the knife to indicate Kilgore ever used it in an attack on Beichner. The detective opined that, based on Kilgore's position on the bed and the location of the knife, she did not believe that Kilgore dropped it. Further, the role Kilgore's intoxication may have played, if any, was for the jury to determine. The issue of self-defense is an issue of fact to be determined by the jury, and the jury was free to accept or reject the defensive issue. *See Saxton*, 804 S.W.2d at 913.

After reviewing all of the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of murder

8

beyond a reasonable doubt and also could have found against Beichner's self-defense issue beyond a reasonable doubt.

* * *

We overrule Beichner's issue and affirm the trial court's judgment.

|  |  |
|---|---|
| /s/ | Jeffrey V. Brown |
|  | Justice |

Panel consists of Chief Justice Hedges and Justices Brown and Busby.

Do Not Publish — TEX. R. APP. P. 47.2(b).